EDMUND WILSON, attorney-general, appellant,

*v.*

STATE WATER SUPPLY COMMISSION et al., respondents.

[Submitted December 8th, 1913.   Re-submitted December 7th, 1914.
Decided March 1st, 1915.]

1. A "civil information" is a legal proceeding in chancery, older than the court of equity, whose equitable powers, when acquired, were termed "extraordinary" to distinguish them from its ordinary or legal juris-diction.

2. An information by the attorney-general on behalf of the state to enjoin a state commission from carrying out an unauthorized contract to purchase land, being an action affecting all the people of the state, presented a strictly legal remedy and was addressed to that legal juris-diction of the chancellor which originated in the doctrine of the im-peccability of the sovereign and the righteousness of his purposes towards his subjects.

3. *P. L. 1912 p. 556*, authorizing the state water supply commission to acquire property, does not authorize the commission to exercise judicial or *quasi*-judicial powers, but merely to exercise the administrative func-tions of a purchasing agent, and therefore the common-law writ of *cer-tiorari* will not lie to review its action in entering into an invalid con-tract to buy land.

4. Whenever jurisdiction was originally acquired, and the scope of the common law has since become enlarged so as to furnish an adequate legal remedy, the earlier jurisdiction, even as to a court of equity, is not thereby destroyed or lessened, though it is made concurrent.

5. That *P. L. 1912 p. 556*, which authorizes the state water supply commission to acquire property, provides that contracts under it shall be reviewable by the supreme court as to reasonableness and fairness, does not preclude remedy through an information filed by the attorney-general to enjoin the carrying out of contracts under such statute, on the ground that they are illegal because entered into in excess of the power conferred on the commission.

6. *P. L. 1912 p. 556*, which authorized the state water supply com-mission to acquire property, but is silent as to the amount of the in-debtedness that may be created thereby, will not be construed to author-ize a contract in violation of constitution, article 4, section 6, paragraph 4, forbidding the legislature to create any debt of the state which with pre-vious debts shall exceed $100,000, unless authorized for some single object or work to be distinctly specified by law submitted to the people and providing for payment of same within thirty-five years.

7. A contract by the state water supply commission to purchase lands and deliver bonds therefor of a par value of $1,000,000, secured by a mortgage on the property, which contract purported to be executed under authority of *P. L. 1912 p. 556*, authorizing the commission to acquire property, was violative of constitution, article 4, section 6, paragraph 4, forbidding the legislature to create any debt of the state which with previous debts shall exceed $100,000, unless authorized for some single object specified by a law submitted to the people and providing ways of paying same within thirty-five years.

8. Where a contract which is made by the state water supply commission, an agency of the state, and incurs an obligation in violation of constitution, article 4, section 6, paragraph 4, limiting the right to create state indebtedness, is challenged by the state on information of the attorney-general, the court should prevent it from going into effect.

On appeal from a decree of the chancellor, whose opinion is reported in *82 N. J. Eq. 32.*

This appeal brings up a decree of the chancellor sustaining a demurrer to an information filed by the attorney-general to enjoin the carrying out of a contract between the state water supply commission and the executors of the Joseph Wharton estate for the acquisition for state purposes of a tract of land at a purchase price of $1,000,000, to be secured by a mortgage on the land so purchased. The information avers that the state water supply commission in making this contract was the agent of the State of New Jersey by virtue of a statute of this state (*P. L. 1912 p. 318*), and that the lands so purchased will be acquired by the State of New Jersey for the purposes set forth in such statute, and that the debt incurred in the acquisition of such lands for such purposes is a debt of the state within the meaning of article 4, section 6, paragraph 4 of the constitution, and that the creation of such debt (which is in excess of $100,000 and not of the sort excepted by the constitution) was not within the authority conferred upon said commission by the statute in question.

The constitutional provision is as follows:

"The legislature shall not, in any manner create any debt or debts, liability or liabilities, of the state, which shall singly or in the aggregate with any previous debts or liabilities at any time exceed one hundred thousand dollars, except for purposes of war, or to repel invasion, or to suppress insurrection, unless the same shall be authorized by a law for some single object or work, to be distinctly specified therein; which

law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within thirty-five years from the time of the contracting thereof, and shall be irrepealable until such debt or liability, and the interest thereon, are fully paid and discharged; and no such law shall take effect until it shall, at a general election have been submitted to the people, and have received the sanction of a majority of all the votes cast for and against it at such election; and all money to be raised by the authority of such law shall be applied only to the specific object stated therein, and to the payment of the debt thereby created. This section shall not be construed to refer to any money that has been, or may be, deposited with this state by the government of the United States."

To this information the executors of the Wharton estate filed a general demurrer specifying as the grounds thereof that the contract set forth in the information was made by the state water supply commission under statutory authority constitutionally conferred upon it, and that the attorney-general was not entitled to relief in a court of equity.

This demurrer was sustained by the chancellor in an opinion in which the salient features of the contract in question are set forth with sufficient particularity, the general result reached by the opinion being that the debt created by such contract was that of the state water supply commission and not that of the State of New Jersey.

The appeal taken by the attorney-general has been reargued at the suggestion of the court with especial reference to the question whether information or *certiorari* was the proper remedy.

*Mr. Theodore Backes,* assistant attorney-general, *Mr. John W. Wescott,* attorney-general, and *Mr. Edmund Wilson,* former attorney-general, for the appellant.

*Mr. J. Edward Ashmead* and *Mr. Frederick J. Faulks,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

A civil information is a legal proceeding in chancery older than the court of equity, whose equitable powers, when acquired, were

termed "extraordinary" to distinguish them from its ordinary or legal jurisdiction.

Thus Blackstone says that in the court of chancery

"there are two distinct tribunals: the one ordinary, being a court of common law; the other extraordinary, being a court of equity. The ordinary legal court is much more ancient than the court of equity." *3 Bl. Com. 47.*

A generation earlier it was said:

"In the chancery are two courts or rather two manners of powers, the one ordinary, wherein the proceedings are according to the laws and statutes of the realm; the other extraordinary, according to the rules of equity. This court, as a court of law, had heretofore great extent of jurisdiction and multiplicity of business. By this short view it appears that the matters determined in the chancery according to the rules and methods of the law must in times past have created much business in the court and that at this day there must be sometimes proceedings in this court according to law."

The quotation is from a controversial pamphlet published anonymously in 1727 and referred to by Judge Story as "by Lord King (or whoever else was the author of the treatise entitled The Legal Judicature of Chancery stated)." *1 . Eq. Jur. 44.*

It is now known that it was written by Samuel Burroughs, with the assistance of William Warburton, the famous religious controversialist. *Life of Lord Hardwicke (1913) 94, 95.*

Judge Story is also authority for the statement that among the earliest writers of the common law, such as Bracton, Glanville, Britton and Fleta (and he might have added *The Mirror*), there is not a syllable to be found relating to the equitable jurisdiction of the court of chancery. *1 Eq. Jur. 39.*

It is to this period when the chancery was a court of law, and the chancellor a common law judge, that we must refer those legal procedures in chancery, of which information by the attorney-general was the most important, as it has proved to be the most enduring. Indeed, it is more than probable that these legal procedures arose in the *aula regis* itself, and upon its dissolution were parceled out to the chancellor because of his more intimate relations to the crown. Certain it is that upon the breaking up

of that royal council the chancellor emerged as a distinct court having a legal jurisdiction closely connected with the royal prerogatives and duties.

This was in the time of Edward I. and the equitable jurisdiction of the court did not arise until the reign of Edward III.

Short of compiling a treatise from sources equally available to all, it must suffice to say that the legal jurisdiction of the chancellor centered around two fundamental conceptions—the impeccability of the sovereign and the righteousness of his purposes toward his subjects. The king could do no wrong and the chancellor was the keeper of his conscience. From those conceptions it followed that if a subject was wronged by the king the chancellor would redress it, and that if all of the king's subjects suffered from an act unlawfully done in his name, the chancellor, upon being so informed, would see that right was done.

Of this latter class was the cancellation of letters patent when made against law or upon untrue suggestion, whereby the regalia or common domain was diminished, which was done in chancery, not, however, upon information, but by *scire facias,* for the reason that the patent was a record in that court. *8 Bac. Abr. 609; 3 Bl. Com. 45, 48; Attorney-General* v. *Sooy Oyster Co., 78 N. J. Law 394* (at *p. 407*).

With few exceptions, however, the redress of public injuries in the name of the king was instituted by the attorney-general by an information which, as the name imports, merely informed the chancellor of the existence and nature of the public wrong; it being considered beneath the dignity of the king to pray for relief in his own courts and also that the keeper of his conscience had but to be informed of a public wrong in order to right it.

Confining our attention to cases resembling in principle the one now before us, the essentials of this jurisdiction were that the information should be exhibited by the attorney-general as the representative of the sovereign and that it should refer to matters by which the public or public rights were affected by unlawful acts done in the name of the king or by some agency or instrumentality of his government.

These essentials of jurisdiction, being fundamental principles of the common law, survived the changes wrought by the Revolu-

tion, and exist in this country as a part of the common law excepting where altered by constitutions or legislative enactments of which in this state there is no trace. It would be quite profitless to rehearse the changes in practice and forms of procedure that have been adopted in those jurisdictions in which this common law proceeding still obtains, or to enumerate those in which, owing to the abolition of chancery or the merger of the courts, it has been measurably lost sight of. In the federal courts such actions are brought directly in the name of the United States by a bill in equity, and even in this state the information, both as to its prayer and the relief sought, no longer conforms strictly to the old landmarks. The removal of a landmark, however, does not destroy a title, and in all of its essentials this legal jurisdiction of chancery is maintained in this state, as evidenced by a large number of cases, a few of which may be cited at random. In *Newark Aqueduct Board* v. *Passaic, 45 N. J. Eq. 393, 401,* the *ratio decidendi* was that "the conservation of public interests is with the state and its attorney-general." Of an early case, decided in 1834, it is said: "The doubts expressed by the chancellor in *Attorney-General* v. *New Jersey Railway and Transportation Co., 3 N. J. Eq. 140,* have been dissipated and contradicted by the later course of adjudication." *1 Eng. Rul. Cas. 573.*

In *MacKenzie* v. *The Trustees, 67 N. J. Eq. 652, 683,* and in *The Trustees* v. *Attorney-General, 78 N. J. Eq. 1,* the proper office of the attorney-general is recognized and stated. In *Stevens* v. *Stevens, 24 N. J. Eq. 77, 82,* an equity suit that concerned the famous Stevens floating battery, the attorney-general interposed an information in order to assert a public legal right in the State of New Jersey. And the list might be indefinitely extended. The cases affecting *quasi*-public bodies are collected in *Attorney-General* v. *Firemen's Insurance Co., 74 N. J. Eq. 372.*

That none of these cases is on its facts just like the one before us is aside from the point, which is that the present case presents every essential of the common law jurisdiction by information, viz., action by the attorney-general on behalf of the state to redress an injury arising from an unlawful act of a state agency affecting all the people of the state. This brings such action clearly within the principle of the common law, and it is by such

principles that we must be guided rather than by precise precedents or by the presence or absence of modern instances. Enough has been said to point out that we are dealing with a strictly legal remedy and not with the court of equity or with any encroachment of equitable jurisdiction upon the writ of *certiorari*. Indeed, the present case is not within the province of the common law writ of *certiorari*, for the reason that the act of 1912, which is the one under review, does not call for the exercise of judicial or *quasi*-judicial powers, but solely for the administrative functions of a purchasing agent.

Hence, the review of the action taken under such statute is solely by force of that extension of the writ of *certiorari* that obtains in this state to a greater degree than elsewhere. To this situation the pertinent rule, even as to a court of equity, is that whenever jurisdiction was originally acquired, and the scope of the common law has since become enlarged so as to furnish an adequate legal remedy, the earlier jurisdiction is not thereby destroyed or lessened, although it is made to be concurrent. *1 Pom. Eq. 182.*

It has not escaped our attention that the statute of April 1st, 1912, provides that contracts and obligations under it shall be subject to review by the supreme court as to the reasonableness and fairness of the terms and conditions thereof. These, however, are not the matters at which the present information is aimed, which are the illegality of the contract and the absence of power on the part of the water commission to enter into it.

Upon this branch of the case, therefore, we conclude that the attorney-general in exhibiting his information in the court of chancery was within his legal rights and that the question presented by this appeal must be considered upon its merits.

The chancellor sustained the demurrer to the information upon the ground that the water supply commission was "a corporate entity apart from the state," that its contract was not the contract of the state, and that the mortgage debt for the purchase price of $1,000,000 was the debt of such corporate entity and not that of the state. This result was reached by the chancellor, contrary to his own views, because of what he conceived to be the controlling effect of the decision of the supreme court in *Van*

*Cleve* v. *Passaic Valley Sewerage Commissioners, 71 N. J. Law 183, 514.* In this he was in error. What was there held was that the constitutional provision now under consideration "has no application to local or municipal indebtedness." Such decision has no bearing upon the indebtedness with which we have to deal, which is created by a state agency that is in no sense local, since its authority is to acquire lands and water rights for the general and common use of the inhabitants of the state, and which is in no sense a municipal agency, since it possesses not a shred of governmental power.

That the authority thus exercised in behalf of the inhabitants of the state is that of a purchasing agent appears in every provision of the statute. The lands so acquired are state property, which would conclusively appear if this commission were to be abolished, in which event the lands that had been so purchased would belong either to the state or to the individuals who had composed the commission, an alternative that admits of but one conclusion. The authority of the commission to act as such purchasing agent is contained in the statute of April 1st, 1912, and the sole question to be decided is whether or not such statute conferred upon the commission the power to make the contract in question by which the entire purchase price, amounting to $1,000,000, is left unpaid as a mortgage debt upon the lands purchased. If by this statute the legislature has authorized the making of this contract the debt thereby created is one that is created by the legislature within the meaning of the constitutional provision, since by the fundamental maxim of agency the legislature creates whatever it authorizes its agent to create. But, by an established canon of construction, the statute will not be construed to authorize the contract if the effect be the creation of a debt that the legislature is by the constitution prohibited from creating. A statute, by force of this familiar canon, will, if possible, be so construed as to render it constitutional. In the present case, there is no difficulty in so construing the statute, which is absolutely silent as to the amount of indebtedness that may be created in the purchase of lands; and which must therefore be construed as not authorizing the present contract, if the debt thereby created is in excess of the constitutional power of

the legislature. This brings us to the crux of the case, which is whether this statute would be constitutional if it in terms authorized the creation of a mortgage debt of $1,000,000. A mortgage debt is clearly within the language of the constitution, for the simple reason that the language there used is broad enough to cover every manner of debt; a debt created "in any manner" is the unqualified constitutional description. The only question is whether we shall pare this language down and say that it means only this sort of debt or only that sort. The principal attempt in this direction is to limit the word "debt" to actionable debts, *i. e.,* to those the payment of which is enforceable. For such a limitation there is not the slightest justification either in common usage or in the context. Common usage reflects common experience, which teaches us that the vast majority of debts are paid without any reference to their enforceable character. Why, therefore, should the exceptional case be singled out as illustrative of common usage in order to give to a word the sense in which it is most infrequently used? A debt against the enforcement of which the statute of limitations has run is in common usage "an outlawed debt," and gambling debts are even spoken of as "debts of honor."

Another attempt to pare down the constitutional language is based upon the argument that a debt that is to be collected from a particular fund, or that is to be made out of a particular piece of land, is for that reason not a debt, an illogical argument that carries with it its own refutation. As a matter of common usage, no term is more familiar than "mortgage debt."

If the context be regarded, we find that it not only gives no support to these limitations, but, on the contrary, distinctly refutes them, for in the context "debt" is connected with "state" and "legislature," neither of which is amenable to that enforcement of debt to which it is sought to limit the meaning of that word. But the context goes further than this, in a most significant direction, when we consider that the only manner in which the legislature pays a debt is by the making of an appropriation. Regard for the context, therefore, must at least constrain us not to deny to the word "debt" its ordinary meaning merely because it is payable by a legislative appropriation. It is at least a reason-

able construction that what the framers were guarding against were not suits and actions against the legislature, which they knew could not be brought, but debts incurred by the legislature which they knew might be paid by appropriations if they were permitted to be contracted. That this was no fanciful anticipation is shown by the contract now before us which provides for a sinking fund for the payment of the mortgage debt, the first source of which is: "(1) Any and all moneys which shall from time to time be appropriated by any legislature of the State of New Jersey towards the principal of said bonds or any part thereof."

An additional sinking fund is provided after five years, "this sinking fund shall be provided (1) from any appropriations made by the legislature of the State of New Jersey." Finally, it is provided that the mortgage debt shall be made out of the property "unless a special appropriation be made by the legislature of the State of New Jersey."

Obviously, there are very practical reasons why the word "debt" in the constitution should be construed to include those payable by legislative appropriation; it is against the construction of such debts that the constitutional provision is aimed and not against voluntary appropriations for any lawful object.

It is in this connection of significance to inquire what was the object of these appropriations that were to be made "from time to time," first to the original sinking fund, then five years later to the additional sinking fund, and finally to the satisfaction of the mortgage debt. Were they gifts—or were they payments made in the reduction or discharge of a debt? If, after the land had been improved in the manner contemplated by the contract, and after a part of the purchase price had been paid the mortgage was foreclosed and the legislature appropriated the money necessary to redeem its property, would it not be the payment of a debt? The very decree on which such payment would be made would so dominate it.

In dealing with all of these attempts to pare down this provision of the constitution, it must be constantly borne in mind that it is the only one in that entire instrument in which the right to pass upon a law after it has been enacted by the legisla-

ture is expressly reserved to the people. Such a provision should be construed so as to effectuate, not to frustrate, its object, which latter result is surely accomplished if the propriety of a purchase of this magnitude can, by a general law, be turned over bodily to four or five citizens, however estimable, instead of being, as the constitution requires, passed upon by the legislature itself, *i. e.*, by the senate, the house of assembly and the governor. For, it is only when this has been done, and the specific object sought, together with the ways and means, have been enacted into a law that the referendum provided by the constitution can be had. It cannot be that the legislature by a wholesale abdication of its constitutional functions can defeat this unique provision of the organic law. The only way to avoid such a criticism is by holding, as we do, that the statute that was enacted applied only to purchases that did not create an indebtedness that would violate this constitutional provision, and, as has been pointed out, the statute thus construed affords no authority for the contract that was entered into on behalf of the state.

A contract thus entered into by a state agency without authority when challenged by the state itself should not be permitted to go into effect. This, in substance, is what was set forth and charged by the attorney-general in his information; it was error, therefore, to sustain the demurrer thereto.

It is perhaps unnecessary to add that the decision of this legal question in no way involves the propriety of the purchase in question. Our sole concern is that a right reserved to the people by their constitution shall be secured to them by their courts.

The decree of the court of chancery is reversed, and the cause remitted to be proceeded with therein according to law and the practice of that court.

SWAYZE, J. (dissenting).

Since I have the misfortune to differ from a majority of the court, and the question is one of great importance and involves substantially the power of the legislature to create a subordinate agency for a public purpose endowed with powers adequate to its work, I think I ought to express the reasons for my dissent. In dealing with any constitutional question, it has been the rule of

the courts from the very beginning of our constitutional law, laid down by Chief-Justice Marshall himself, not to declare an act unconstitutional unless it was clearly so. Nowhere has this restraint imposed by the courts upon their own action been asserted more strongly than in our own courts in recent years. The careful observance of this restraint, I think, is of the utmost importance. Otherwise the courts run the risk of usurping the function of the governor to veto legislation, and of eventually losing the power to act effectively when the constitutional limitations are transgressed. It is in this spirit that I approach the present case. The question is: Is it clearly beyond the power of the legislature to create a subordinate public agency empowered to acquire property to be paid for out of the property itself and upon the express condition that the mortgage and bonds given for the purchase-money shall in no manner create or constitute any present or future indebtedness or liability of the state?

I think the present proceeding is not beyond the power of the legislature, first, because the debt, if there be a debt, is that of a subordinate public agency only, and second, because in this case there is no such debt as was meant by the constitutional provision.

In *Van Cleve* v. *Passaic Valley Sewerage Commission, 71 N. J. Law 183* (at *p. 228*), Mr. Justice Pitney said that the constitutional provision against a state debt had no applicancy to local or municipal indebtedness, and that a contrary view would overthrow practically all our municipal bond issues. The judgment was reversed (*71 N. J. Law 574*), but solely upon the ground that the commission in that case was clothed with the power of taxation, and this court was careful to say that its conclusions resulted in sustaining the power of the legislature to engage directly in the undertaking of the purification of the Passaic valley sewerage district, including its right to put forth directly for this purpose its police powers, and to exercise such powers through a board of commissioners selected and appointed in the manner provided in the act. As is well known, that enterprise is now proceeding.

The present case is free from the difficulty that arose in the *Passaic Valley Sewerage Case*. No power of taxation is given to the commission. No property can be held for the payment of the purchase price except the very property itself. It is expressly provided that the claims of bondholders shall not be enforced against other holdings, property or rights of the commission. The authority to use assets of the commission unappropriated is no more than an authority to use funds actually in hand for a legitimate public purpose, very much as the proceeds of sale of riparian lands are used for the school fund. The provision for the payment into a sinking fund of any moneys which shall be appropriated by any legislature toward the principal, leaves it entirely optional with each successive legislature whether to appropriate or not, and in no way contravenes or modifies the express provision that the mortgage and bonds shall not create or constitute any indebtedness or liability of the state. Whatever a legislature may thus appropriate hereafter is a voluntary appropriation for a legitimate public purpose. If the legislature cannot constitutionally make such appropriation for the benefit of this subordinate public agency, we must assume that it will not do so; this provision then becomes nugatory, or may be excised. If the legislature can constitutionally make such an appropriation, I see no objection to the money when appropriated being used for the purpose which the legislature designates. I do not overlook the fact that the powers of the Passaic valley sewerage commission were not co-extensive with the state. There are, however, other subordinate public agencies, incorporated and unincorporated, which incur obligations properly called debts for which the state has to answer.

I doubt if there is a day when unpaid obligations of this kind incurred in behalf of hospitals, prisons, reformatories and other charitable institutions do not exceed one hundred thousand dollars. A glance at the report of the state treasurer for 1914 shows more than one day when payments made at the end of a calendar month, for obligations incurred during the preceding month, exceeded one hundred thousand dollars. Whether there was a credit extended in these cases which would prevent the obligations from being past due at the time they were paid, I do

not know, but the present discussion as to the possibility of a deficit in the state's revenues admonishes us to be careful how we hold that the indebtedness of subordinate agencies in excess of one hundred thousand dollars is forbidden by the constitution. No one has ever suggested, or is likely to suggest, that these debts of the state are within the constitutional prohibition. Some, no doubt, are for current expenses, others for extraordinary expenses, such as buildings. The reason why these debts are not regarded as transgressing the constitution may be in part because revenues to meet them are already in sight, in part because they are obligations of subordinate state agencies. But the revenues are not always in sight and the obligations are not always the obligations of subordinate state agencies. The real reason why such debts have never been supposed to transgress the constitutional provision, is that they are not the kind of debts and liabilities which the constitution meant to prohibit. Some qualification must undoubtedly be placed upon the words "debts and liabilities." I think that qualification is to be found in the circumstances that existed at the time the constitution of 1844 was adopted, and that the object of the framers was to prohibit the issue of state bonds, or similar obligations, failure to pay which might expose the state to the reproach of repudiation under which some of our sister states then suffered. That reproach can never be brought in a case like the present, where the whole scheme is carefully drawn to enable the public to secure what the legislature thought was for the public benefit without the state itself incurring any legal or moral obligation whatever. The plan avoids the evils which the constitutional provision was designed to meet, since the specific property acquired must be worth what is paid for it, or the owners would not sell on such favorable terms to the purchaser, and the public can at most lose no more than the specific property. The burden of taxation is not increased. There is no danger of the state repudiating its obligations, since, by the express terms of the contract, it incurs none.

If we look to other states where similar plans have been adopted, under similar statutory or constitutional provisions, the great weight of authority is in favor of their constitutionality.

It is enough to cite some of the cases collected in the very satis-factory brief of counsel for the respondents: *Perrigo* v. *City of Milwaukee, 65 N. W. Rep. 1025; City of Milwaukee* v. *Milwaukee Company, 69 N. W. Rep. 819; Burnham* v. *City of Milwaukee, 75 N. W. Rep. 1018; Winston* v. *City of Spokane, 41 Pac. Rep. 888; Faulkner* v. *City of Seattle, 53 Pac. Rep. 365; Dean* v. *City of Walla Walla, 92 Pac. Rep. 895; Griffin* v. *City of Tacoma, 95 Pac. Rep. 1107; Brockenborough* v. *Board of Water Commissioners, 46 S. E. Rep. 28; Kelly* v. *City of Minneapolis, 65 N. W. Rep. 115.*

It is far from clear to me that the present scheme is forbidden by the constitution, and I think the decree should be affirmed. Mr. Justices Trenchard, Minturn and Black and Judges White and Terhune concur in these views.

*For affirmance*—SWAYZE, TRENCHARD, BLACK, WHITE, TERHUNE—5.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, PARKER, BERGEN, KALISCH, BOGERT, VREDENBURGH, HEPPENHEIMER, WILLIAMS—9.