BOROUGH OF SAYREVILLE, CITY OF SOUTH AMBOY AND COUNTY OF MIDDLESEX, ALL MUNICIPAL CORPORA-TIONS, AND BOARD OF PUBLIC UTILITY COMMIS-SIONERS, DEPARTMENT OF PUBLIC UTILITIES OF THE STATE OF NEW JERSEY, PLAINTIFFS-RESPOND-ENTS v. THE PENNSYLVANIA RAILROAD COMPANY, A BODY CORPORATE, DEFENDANT-APPELLANT.

Argued September 9, 16, 1957—Reargued January 6, 1958— Decided February 24, 1958.

Mr. Stephen VR. Strong argued the cause for appellant (Messrs. Strong & Strong, attorneys; Messrs. Stephen VR. Strong and Windsor F. Cousins, of the Philadelphia Bar, of counsel).

*Mr. Joseph T. Karcher* argued the cause for respondents (*Mr. Joseph T. Karcher,* attorney for Borough of Sayreville; *Mr. John E. Mullane,* attorney for City of South Amboy; *Mr. Samuel V. Convery,* attorney for County of Middlesex. *Messrs. Joseph T. Karcher, John E. Mullane* and *Samuel V. Convery,* of counsel).

*Mr. Howard T. Rosen,* Deputy Attorney-General, argued the cause for respondent Board of Public Utility Commissioners (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. Howard T. Rosen,* of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J.   On July 25, 1956 the Board of Public Utility Commissioners ordered appellant railroad to reconstruct a bridge over its right-of-way in the Borough of Sayreville at the railroad's cost.   The estimated cost is $110,000.   The railroad conceived that under *L.* 1947, *c.* 178 (*N. J. S. A.* 48:12–67.1) it should pay but 15% of the cost and the Board the balance.   It petitioned the Board to modify the order accordingly, and from a denial it appealed.   The Appellate Division affirmed, 44 *N. J. Super.* 172 (1957), and we granted certification.   24 *N. J.* 222 (1957).

The Appellate Division held that with respect to public highways other than state highways the 1947 statute authorizes a division of cost only for the elimination of an existing crossing at grade and leaves unaffected the pre-existing responsibility of the railroad under *R. S.* 48:12–49 to bear the entire cost of the work where the crossing is not at grade.

The existing bridge erected by the railroad in 1901 carries a county highway over the railroad right-of-way.   The bridge is narrow and is now a bottleneck.   The improvement here involved is necessary to meet local transportation needs reflecting the growth of the community.

The issue before the Board was one of statutory interpretation. Before the Appellate Division, the railroad added a constitutional challenge. The Appellate Division understood the added issue to be whether the railroad's liability must be confined to the amount of the benefit which the improvement would confer upon the railroad. It held that the cost need not be allocated on the basis of benefits, and that where the improvement is required to meet local transportation needs and further safety and convenience made necessary by the growth of the community, the entire cost may be assessed upon the railroad. *Atchison, Topeka & Santa Fe Railway Co. v. Public Utilities Commission,* 346 *U. S.* 346, 74 *S. Ct.* 92, 98 *L. Ed.* 51 (1953).

Appellant does not quarrel with the stated conclusion of the Appellate Division, but rather says the constitutional issue it proffered was that since in some circumstances the State may not saddle the entire cost upon a railroad, *Nashville, Chattanooga, & St. Louis Railway Co. v. Walters,* 294 *U. S.* 405, 55 *S. Ct.* 486, 79 *L. Ed.* 949 (1935), our statute, *R. S.* 48:12–49, must fall because it would authorize unconstitutional action in such other situations. The rule appellant would invoke, that the validity of a statute will be judged by what may be done under it, has been applied sparingly, and largely to penal measures. 2 *Sutherland, Statutory Construction* (3d ed. 1943), §§ 2413–19, *pp.* 190–98; 11 *Am. Jur., Constitutional Law,* § 164, *p.* 858. The Legislature cannot always anticipate the constitutional formula which may be judicially devised and perhaps revised with changing circumstances. There is no reason to insist upon perfect anticipation. If a statute is reasonably appropriate in its overall approach, it should be upheld notwithstanding it may be invalid in special circumstances, when it is apparent that the Legislature would want the act to prevail where constitutionally it may. Such surely is the case here. In *Nashville* it was observed with respect to the very area here involved that "A statute valid as to one set of facts may be invalid as to another" (294 *U. S.,* at *page* 415, 55 *S. Ct.* at *page* 488). Since appellant does

not claim, and surely has not demonstrated, that the act is invalid in its application to the facts of this case, the constitutional challenge must fail.

We proceed to the question whether the Appellate Division correctly construed the 1947 statute to be inapplicable where the grade-crossing elimination had theretofore been accomplished. It is argued that it is absurd to distinguish between the cost of eliminating existing grade crossings and the cost of replacing a prior elimination. We do not believe this is so. We agree with the Appellate Division that the 1947 statute was intended to foster elimination of existing grade crossings; that the Legislature was willing that the state share in the cost of combatting existing hazards at grade, but did not intend it to assume any part of the railroads' burden as to eliminations already accomplished. A decision to confine the expenditure of state moneys to the removal of still existing grade crossings cannot be said to be capricious or arbitrary.

Surely that "classification" is not arbitrary in any constitutional sense; and if it were, the 1947 statute would fall leaving the railroads with their pre-existing liability. Such arbitrariness, if it were a fact, would not warrant a judicial extension of the statute beyond the legislative will. Whether the State ought to absorb 85% of the cost of remodeling or replacing structures heretofore erected to eliminate grade crossings is wholly a matter of policy which must be left to the other branches of government. We can properly concern ourselves only with the question whether the Legislature has so decided.

A review of the legislative history cogently supports the judgment of the Appellate Division. (Italics in quotations herein are added.)

It is not disputed that initially under the statutory scheme the railroads held the entire burden with respect to eliminations. *R. S.* 48:12–49. In 1913 the Fielder Act (*c. 57*) was adopted vesting the Board of Public Utility Commissioners with jurisdiction to order eliminations. *Section* 1 (in its later form it is *R. S.* 48:12–61) provided

that "Whenever a public highway and a railroad *cross each other at the same level* and it shall appear to the board that such crossing is dangerous to public safety, or that the public travel on such highway is impeded thereby," the Board may order the railroad company "to alter such crossing, or crossings, according to plans to be approved by said board, by substituting therefor a crossing, or crossings, not at the grade of such public highway either by carrying such public highway under or over such railroad, or railroads, *or by reconstructing such railroad, or railroads, under or over such public highway,* or by vacating, relocating or changing the lines, width, direction or location of such highway and the opening of a new highway in the place of the one ordered vacated." *Section 2* (in its later form *R. S.* 48:12–62) provided "The entire expense of such alterations, changes, relocation or opening" shall be paid by the railroad, with certain provisos not here pertinent.

Two observations should be made with respect to the Fielder Act. (1) The act dealt solely with eliminations of *existing crossings at grade.* (2) The word "reconstructing," italicized in the quotation in the preceding paragraph, related solely to reconstruction of a railroad as part of a plan for the elimination of *an existing crossing at grade.* It did not refer to the reconstruction of a bridge by which a grade crossing had already been eliminated.

The first departure from the policy of imposing the total cost upon railroads occurred in 1929 when *chapter* 88 was adopted, whereby in *section* 1 the State Highway Commission was required "to formulate a program for the elimination of railroad *crossings at grade on State highways,* the improvement, relocation and *reconstruction of crossings of railroads and State highways not at grade,* and the location and construction of new *crossings* of railroads and State highways *not at grade* \* \* \*." (*R. S.* 48:12–68). *Section* 3 provided "The cost of the work shall be borne by the State and the railroad company involved in equal shares." (See *R. S.* 48:12–70, 71). This statute applied only to crossings on State highways and hence is not applicable to

the present case. Its provisions, however, are noted because of their bearing upon the construction of the 1947 statute.

In 1930, the Fielder Act was amended by *chapter* 101. *Section* 1 *of the Fielder Act* was thereby amended to delete crossings on state highways (because of the 1929 statute noted immediately above). *Section* 2 was amended to provide that the cost "shall be paid fifty per centum by such railroad company * * * and fifty per centum by said board out of funds to be provided for that purpose."

There can be no doubt that the 50–50 program thus inaugurated in 1930 related solely to elimination of *crossings at grade*. The language of *section* 1 *of the Fielder Act* quoted hereinabove remained unaltered (except for the exclusion of state highways) and "reconstructing such railroad" remained merely one of the methods for eliminating an existing crossing at grade. Contemporaneous legislation to provide funds for sharing the cost of the eliminations under the 1929 and 1930 acts emphasizes that this is so. *Section* 8(*a*) *of chapter* 102 *of the Laws of* 1930 provided for the distribution of $2,000,000 per year from the receipts of motor fuel taxation "To the Board of Public Utility Commissioners * * * to be used by it to defray the public share of the cost of *eliminating grade crossings*" under the 1930 amendment of the Fielder Act. It was provided that such funds shall not be furnished the board "on account of the cost of *eliminating such grade crossings* in any year in which funds for such purpose shall be available in the 'Grade Crossing Elimination Fund' provided for by an act pending at this session." The pending act thus referred to was enacted as *chapter* 228. It authorized the issuance of bonds and to the extent here pertinent the reference is to "the cost of *eliminating railroad grade crossings* on highways other than State highways." (*sec.* 1).

In the *Report to the Legislature of the Commission Created by Concurrent Resolution of April* 17, 1929, which recommended the 1930 amendments of the Fielder Act and Fuel Tax Act, the entire emphasis is upon the need to eliminate existing grade crossings. At page 4 it was stated that "the

danger at highway grade crossings is constantly increasing as the use of the highways by motor vehicles increases," and at page 8 the report reads:

"* * * *It is good policy to eliminate the dangerous grade crossings as fast as possible,* and while it might be desirable to provide larger sums for that purpose, if they could be found, there are certain practical considerations which govern our conclusions; namely, under *Chapter* 88, the Highway Department is directed to prepare and carry out an annual program relative to crossings of State highways over railroads involving the expenditure of two million dollars on behalf of the State and a like amount on behalf of the railroads. The necessity of avoiding unnecessary interference with the flow of traffic on both the highways and railroads, and the practical limitations which govern the progress of construction work of that character, have influenced our conclusion that if another two million dollars is provided for the elimination of grade crossings on municipal and county highways and the requirement of a like amount to be expended by the railroad companies for that purpose, we will then have in effect grade crossing programs aggregating eight million dollars per year, half of which is to be provided by the State and the other half by the railroad companies. We believe that this amount is as large as either the State or the railroads can consistently provide. Such an annual program would certainly carry forward the progress of grade crossing elimination at a much greater rate than has ever occurred in the past."

The statement of purpose attached to the bill which introduced the 50–50 formula into the Fielder Act accordingly reads:

"The purpose of this act is *to expedite the elimination of dangerous grade crossings* by applying to crossings, other than State highways, the same division of expense between the public and railroad companies as was provided by *Chapter* 88, *Laws of* 1929 (*p.* 138), with respect to crossings on State highways."

The statement of purpose accompanying the bill which became the 1930 amendment of the Fuel Tax Act, referred to above, reads:

"The purpose of this act is to provide funds to pay for the public share of the cost of *eliminating grade crossings* on highways other than State highways under the Fielder Act (*Chapter* 57, *Laws of* 1913, *p.* 91) as amended by a companion bill introduced at this session of the Legislature."

In 1935, the Fuel Tax Act was repealed and a new measure enacted as *chapter* 319. There was continued therein in *section* 1302 the same provision distributing a portion of the proceeds to the Board "to be used by it to defray the public share of the cost of *eliminating grade crossings*" under the Fielder Act as amended in 1930.

Thus it is perfectly clear that if the present controversy had arisen after 1930 but before the 1947 statute, the railroad could not have looked to public funds for any part of the cost.

We come, accordingly, to *chapter* 178 *of the Laws of* 1947. Its purpose was to alter the formula for allocating the cost from an equal division to 85% and 15%. We cannot find a trace of an intention to extend the public role from the limited area of accomplishing further elimination of existing grade crossings, to the assumption of responsibility with respect to past eliminations.

*Section* 1 *of the* 1947 *act* amends *section* 2 *of the Fielder Act* to replace the 50–50 formula with the 85–15 division. It inserted the word "reconstructions" in that section in the phrase "such alterations, *reconstructions,* changes, relocation or opening." What is the meaning of "such * * * reconstructions"? The words can refer only to the *reconstructing of a railroad as part of a plan to eliminate an existing grade crossing* under *section* 1 *of the Fielder Act.* There is nothing else to which it could refer. We suppose "reconstructions" was inserted to avoid any possible contention that the 85–15 formula would be inapplicable because "alterations, changes, relocation or opening" might otherwise not embrace the cost of reconstructing a railroad where the grade crossing elimination plan calls for that work. At any rate, "such * * * reconstructions" can refer only to the reconstruction of a railroad, as already stated.

Appellant seeks support in *section* 2 *of the* 1947 *act.* It provides that:

"*Sections* 48:12–61 to 48:12–66 [The Fielder Act] * * * shall apply to *all* alterations, *reconstructions,* changes, relocations or openings ordered by the Board of Public Utility Commissioners, after

the effective date of this act, and also to *any* alterations, *reconstructions*, changes, relocations or openings ordered prior to such effective date, if no part of the work under such order had been actually commenced on the ground prior to such date.    *    *    *"

The railroad attributes great significance to "all    *    *    * reconstructions." We find none. The role of *section 2* was merely to spell out the effective date of the new 85–15 formula and nothing more. To that end it made the formula effective as to *all* new projects and extended it as well to *any* theretofore ordered if the work had not been commenced on the ground. We cannot conceive of any adjectives other than "all" and "any" which would more clearly express that purpose. And the word "reconstructions," in that *time* provision, can only refer back to "reconstructions" in *section 1 of the* 1947 *act,* which, as already pointed out, refers in turn to reconstruction of a railroad as part of an elimination plan. It would, of course, be remarkable to conclude that "reconstructions" in *section 2 of the* 1947 *act* means something other than "reconstructions" in section 1 of the same act. We add that the 1930 amendment introducing the 50–50 arrangement likewise had a *time* provision to designate the projects covered by that amendment (*sec.* 5, see *R. S.* 48:12–67), which provision essentially parallels *section 2 of the* 1947 *statute.*

Nor can we find anything in the title of the 1947 act to support appellant's view. The title, of course, could not enlarge the operative provisions of the statute, and would be helpful only if there were some ambiguity therein, and we find none. At any rate, the title reveals nothing significant. It reads:

"An Act concerning the elimination of *grade and other crossings* of railroad tracks and highways, amending *sections* 48:12–62, 48:12–70, 48:12–71, and 48:12–77 and *supplementing chapter twelve of Title* 48 *of the Revised Statutes.*"

Stress is placed upon "other crossings" to support the view that the amendments already described above must go beyond elimination of existing *grade crossings.* The answer

is simply this. The *state highway* crossing statute of 1929 (it was amended by *chapter* 234 of the *Laws of* 1931 in respects not here pertinent) provided for 50–50 division of the cost of "the elimination of railroad crossings *at grade* on State highways, and for the improvement, relocation and *reconstruction of crossings of railroads and State highways not at grade,* and the location and construction of new crossings of railroads and State highways *not at grade."* Thus, as to state highways, the 50–50 program of 1929 included *crossings not at grade,* whereas the 50–50 program under the 1930 amendment of the Fielder Act did not. Since the 1947 statute introduced the 85–15 formula into both situations and *section* 4 (applicable to state highways) speaks accordingly of "the elimination of any crossing *at grade* or the improvement, relocation, alteration or reconstruction of any crossing *not at grade* on any State highway," the draftsman included "other crossings" in the title to cover the amendment of the 1929 state highway statute. The reference to "other crossings" in the title of the 1947 act therefore cannot be said to be imperatively applicable to the amendments therein of the Fielder Act.

Nor does the word "supplementing" in the title add anything. The word probably was used because the act introduced the 85–15 division not only as to future transactions but also retroactively as to projects not yet actually started on the ground, and hence the draftsman conceived the act was more than a mere amendment. Whatever the reason, it cannot alter the meaning of the operative provisions of the act.

Nor can any direction be found in the statement of purpose which accompanied the bill which became the 1947 act. It is equally expressive of the purpose to enlarge the formula for distribution of costs. It could not enlarge the operative provisions of the body of the act.

The matter of funds is the clinching consideration. The only moneys at any time appropriated are the receipts from the motor fuel tax and from the bond issue referred to above. In express terms, those moneys are available only for *elim-*

*ination of existing grade crossings* (except as to state highways). Thus, the appellant's position would lead to an incongruous result; it would presently relieve the railroads of any burden as to replacements unless 85% of the cost is furnished by the Board even though the Legislature did not arrange for revenue for that purpose. When in 1930 it decided the public should assume 50% of the cost of elimination of grade crossings, it made provision to implement the program. It made no further provision in 1947 for the reason that it did not thereby intend to assume responsibility in the new area. It would be startling to conclude the Legislature relieved the railroads of any obligation to go forward until such time, if ever, as public funds should be appropriated. We should not attribute that improvident course to the legislative branch. Indeed, appellant's position would require the conclusion that the order in question was wholly beyond the authority of the Board, because the Board is empowered to incur its share of the cost only out of funds provided for that purpose, and no funds have been provided. The Board has no power to commit the State except as to moneys appropriated.

Extended discussion can complicate a relatively simple situation. We would ask this question: Can it fairly be said that any legislator reading the 1947 bill would have understood that by virtue of "reconstructions," "all," "any," and "other crossings" and "supplementing" in the title, a policy of cost-sharing which had been limited to elimination of existing crossings was thereby expanded to embrace replacements of structures relating to past eliminations? We cannot believe that any legislator so understood. Before we conclude that a private liability was transmuted into a public one, doubtless involving a potential of millions of dollars, the purpose so to do should be crystal clear. It should not depend upon intricate interpretation. The ease with which that intention could have been plainly expressed is apparent.

The judgment of the Appellate Division is accordingly affirmed.

HEHER, J. (dissenting). As the CHIEF JUSTICE says, the basic inquiry here has to do with the meaning of *L.* 1947, *c.* 178, entitled "An Act concerning the elimination of grade and other crossings of railroad tracks and highways, amending sections 48:12–62, 48:12–70, 48:12–71, 48:12–77 and supplementing chapter twelve of Title 48 of the Revised Statutes."

The immediate question is whether the cost of constructing a new fireproof bridge to replace the existing "Deep Cut Bridge" built in 1831 or thereabouts over the railroad's right of way across Washington Road in Sayreville, and reconstructed in 1901, is apportionable at the rate of 85% to the State and 15% to the railroad. The railroad concedes the public need for the new structure; the contention is that the cited act of 1947 provides for the sharing of the expense of the improvement at the given ratio of 85%–15%, and if *L.* 1903, *c.* 257, *R. S.* 48:12–49, has not been thereby overridden in this regard, and the entire burden is laid upon it, then the statute is unconstitutional as declaring "a fixed and arbitrary rule, which permits no consideration of what is fair and reasonable, or of any judgment whatsoever," citing *Nashville C. & St. L. R. Co. v. Walters,* 294 *U. S.* 405, 55 *S. Ct.* 486, 79 *L. Ed.* 949 (1935), and *Atchison, Topeka & Santa Fe R. Co. v. Public Utilities Commission,* 346 *U. S.* 346, 74 *S. Ct.* 92, 98 *L. Ed.* 51 (1953).

And the finding of my colleagues is that the "existing bridge erected in 1901 * * * is narrow and is now a bottleneck," and the "improvement here involved is necessary to meet local transportation needs reflecting the growth of the community," just as much so as the 1901 bridge served the needs of that day; but that the 1947 statute "was intended to foster elimination of existing grade crossings; that the Legislature was willing that the State share in the cost of combatting existing hazards at grade, but did not intend it to assume any part of the railroads' burden as to eliminations already accomplished," although the cost of alterations and reconstruction of State highway-road cross-

ings not at grade is to be shared according to the 85%–15% ratio, and a "decision to confine the expenditure of the State moneys to the removal of still existing grade crossings cannot be said to be capricious or arbitrary."

Construction will be aided by a review of the statutes in historical perspective. *L*. 1903, *c*. 257, § 26, *R. S*. 48:12–49, known as the "Railway Act," laid upon every railroad the duty, at its own expense, to "construct and keep in repair" good and sufficient bridges and passages over, under and across the railroad or right of way where any road or street then or thereafter established shall cross the same, so that public travel on the road is not impeded. The bridges and passages were required to be "of such width and character as shall be suitable to the locality in which they are situated." As just said, it was under the presumed authority of this act that the railroad here has been assessed the expense of the proposed Sayreville bridge.

This statute was followed by *L*. 1913, *c*. 57, the "Fielder Grade Crossing Law," which empowered the then recently created Board of Public Utility Commissioners to eliminate railroad-highway grade crossings that had elements of danger to public safety or impeded traffic. The railroad was chargeable with the entire cost of "such alterations, changes, relocation or opening, including damages to adjacent property," save that a street railway using the crossing could be assessed not more than 10% of the expense directly chargeable to the crossing.

Later on, by *L*. 1930, *c*. 101, now *R. S*. 48:12–61 *et seq*., the act was amended, *section* 1, to limit its operation to public highways other than state highways in accord with a recently enacted statute, *L*. 1929, *c*. 88, *R. S*. 48:12–68 *et seq*., placing within the jurisdiction of the State Highway Commission the "elimination of railroad crossings at grade on State highways, the improvement, relocation and reconstruction of crossings of railroad and State highways not at grade, and the location and construction of new crossings of railroads and State highways not at grade," the cost of the work to be borne by the State and the railroad in equal

shares. By *section* 2 of the 1930 Act, *R. S.* 48:12–62, the expense of the grade separation was laid equally upon the State and the railroad.

The 1930 act, as amended by *L.* 1931, *c.* 29, *R. S.* 48:12–61, authorized the Board to order the railroad to "alter" such grade crossing involving "a public highway, other than a State highway," the "alterations" to be made (a) "by substituting" a crossing not at grade "either by carrying such public highway under or over such railroad" or by "reconstructing" the railroad "under or over such public highway"; or (b) by vacating, relocating or changing the lines, width, direction or location of such highway "and the opening of a new highway in the place of the one vacated"; or (c) by relocating the tracks of the railroad where the elimination of the crossing would "unduly injure" the owners of property. And the provision for the equal division of the expense remained as it was, covering "such alterations, changes, relocation or opening, including damages to adjacent property" and the cost of removing, relaying or relocating municipal pipes, conduits and subways.

It is said in argument that the "important thing to note about the Fielder Law is that since its inception it has applied only to the *elimination* of grade crossings"; that this act, *R. S.* 48:12–61 *et seq.,* "is in *Article 12 of Title 48,* as contrasted with *R. S.* 48:12–49 which is found in *Article 11*"; and that the "primary purpose" of the 1947 Act "was to change cost allocation from 50% to 85% under the Fielder Grade Crossing Law and the State highway crossing law." But this classification would seem to be at variance with the outstanding principle and policy of the statute, to apportion such burdens more in keeping with the socio-economic needs and interests attending the great expansion and development of motor vehicle transportation of passengers and freight in our rapidly growing communities, not at all comparable to the demands of an earlier and simpler society, so much so that the railroad, no longer the prime source of danger, is itself in need of protection from the hazards of motor transportation, not to mention

the changed economic factors in this highly competitive field. See *Nashville, C. & St. L. R. Co. v. Walters, supra.* There has long been evidence of ever-increasing financial stress of railroads from the competition of modern transportation facilities by land and air. The motor and air era has revolutionized transportation. Also, the avoidance of traffic interruptions is a major service to highway users; and grade separations, even on secondary roads, are now deemed a significant public service that may well be regarded in assessing the relative benefits of the improvement for a fair and just allocation of the cost as between the State and the railroad, none of which is borne directly by the commercial users of the highway. It goes without saying that an individual's share of the cost of advancing the public convenience must bear some rational relation to the evils to be eradicated or the advantages to be had. *Nashville, supra.* We live and have our being in an era of constant adjustment to changing social and economic concepts related to essential public needs and conveniences; and the 1947 act is but a legislative assessment of the relative responsibilities of the State and the railroads in the vital field of transportation and traffic regulation and security for the common good and welfare, such as is now accorded general recognition in the federal and many of the state jurisdictions. See Federal Highway (Aid) Act, 23 *U. S. C. A., sections* 1–25.

Indeed, the introducer of the Senate Bill which became the act of 1947 affirmed in the appended explanatory statement that the purpose of the measure was "to bring the grade crossing elimination laws of New Jersey more nearly in line with the Federal-Aid Highway Act of 1944 and the grade crossing elimination laws in certain other States," and "[i]t will also progress the elimination of hazards of highway-railroad crossings at grade and reduce the impediments to highway traffic, occasioned by such crossings, in advancement of the recommendations contained in the 35th Annual Report of the Board of Public Utility Commissioners."

The then current policy of other state jurisdictions was to bring the reconstruction of existing grade separations within the cost apportionment ratio. For example: Ohio, *Page's Rev. Code Ann.,* sec. 4957.01; *Indiana, Burns Stat. Ann.,* sec. 55–1810; *Michigan, Stat. Ann.* sec. 9.1141; *West Virginia, Code Ann.,* sec. 1465(9), 1470(14), 1473(1) (17a).

And the Federal Highway (Aid) Act, *sections* 2, 6, *supra,* covers the construction and reconstruction of "primary or interstate" and "secondary or intercounty" highways,; and the term "highway" includes "bridges" and "tunnels."

Our act of 1947 is not entitled "An Act to amend * * *" a given statute by title or numerical designation, but rather "An Act concerning the elimination of grade and other crossings of railroad tracks and highways, amending" the stated *sections* 48:12–62, 48:12–70, 48:12–71 and 48:12–77 "and supplementing" *chapter* 12 of the *Revised Statutes.* Thus, the title reveals a legislative design to regulate, not alone the elimination of grade crossings but "other crossings of railroad tracks and highways" as well, and to supplement the coverage of *chapter* 12 of the *Revised Statutes.* And the regulatory provisions of the Act are quite clearly directed to that end.

By *sections* 3, 4 and 5 of the act, *R. S.* 48:12–70; 48:12–71 and 48:12–77 were amended to provide for sharing the cost, *R. S.* 48:12–68, of eliminating state highway-railroad grade crossings, and the improvement, relocation, alteration and reconstruction of such crossings not at grade, and the location and construction of new crossings of railroads and State highways not at grade where such construction will replace an existing grade crossing there or in the vicinity, according to the stated 85%–15% ratio rather than by an equal division of the burden.

*Section* 1 of the 1947 act amended *R. S.* 48:12–62, the Fielder Law, to prescribe the very same ratio of 85%–15% in sharing the expense of "such alterations, reconstructions, changes, relocation or opening," of grade crossings not involving state highways, permissible under *R. S.* 48:12–61,

omitting a preexisting proviso allowing the use of allotted Government aid in reduction of the railroad's share. Here, for the first time, the word "reconstructions" was inserted between "alterations" and "changes," even though there had been no controversy over the years as to the meaning of the clause.

And the significance of the added term was accentuated by the succeeding *section 2* of the 1947 act, which is not in form an amendment of the preexisting statute but a supplement to *chapter* 12, providing that *"Sections* 48:12–61 to 48:12–66 (the Fielder Law) * * * shall apply to all alterations, reconstructions, changes, relocations or openings ordered" by the Utility Commissioners, *"after the effective date of this act,* and *also* to any alterations, reconstructions, changes, relocations or openings ordered prior to such effective date," if no part of the work so ordered had been "actually commenced on the ground prior to such date." And "No further application" to the Board "shall be necessary in any proceedings in which an order of the board had been made prior to the effective date of this act *to bring the alterations, reconstructions, changes, relocations or openings, so ordered, within the provisions of said sections 48:12–61 to 48:12–66 of this Title."* [Emphasis supplied.] The section was then made inapplicable to "any grade crossing elimination under a State Highway Commission program, pursuant to the provisions of *sections* 48:12–68 to 48:12–77 of this Title."

And so, the measure is not an amendment of but rather a supplement to the Fielder Law, comprised in *chapter* 12 of the *Revised Statutes* as subdivision "A," *sections* 48:12–61 to 48:12–66, covering all crossings not involving a state highway; and it expressly makes these particular sections applicable to *"all* alterations, *reconstructions,* changes, relocations or openings" ordered by the Board after the act became effective, and before under the conditions stated, including *section* 48:12–62, amended by the prior *section* 1 of the 1947 act itself to provide for the 85%–15% ratio, between the State and the railroad, in the division of the

cost of *"such* alterations, reconstructions, changes, relocation or opening" there provided for, the pronoun "such," in contrast to "all" in *section* 2, referring in all seeming to the prior *section* 48:12–61. Unless *section* 2 of the 1947 act be so read, as inclusive of all such local crossings, whether at grade or not, then it can have no meaning whatever. The use of the adjective "all" in this section is in itself significant of that intent. In the narrower view taken by respondents, *section* 1 of the 1947 act would be sufficient in itself. The offered distinction *contra* would run counter to normal English usages and suffer the taint of false perception. There is no *casus omissus* here.

A supplement was not needed merely to implement, as counsel argue, "the section of the act specifying *when* the new division of costs is to begin"; the appropriate place for this regulation would have been *section* 1, amending *R. S.* 48:12–62, to prescribe the new ratio, or *R. S.* 48:12–67. This "new schedule of cost participation" plainly has reference to the enlarged ratio coverage of grade separation, improvements and reconstructions embodied in the section itself; the "effective date clause" is but an incident of the substantive provision expanding the crossing construction made subject to the new cost assessment ratio. The effective date provision governs crossing construction now, for the first time, included in the class subject to the apportionment of the attendant expense between the State and the railroad, that is to say, it is applicable to work of the enumerated class ordered by the Board *after the act became effective* and *also* work ordered before if not in part commenced on the ground prior to that day. There was no need for a like provision in relation to state highway-railroad crossings; hence, the express exclusion from the operative force of this regulation of "any grade-crossing elimination under a State Highway Commission program pursuant to" *sections* 48:12–68 to 48:12–77.

And the title of the 1947 act suggests subject matter comporting with this intent. It declares the object of the measure to be the elimination of "grade *and other crossings*

of railroad tracks and highways"; and it affirms a purpose to "supplement" the new ratio coverage of Chapter 12. When the words of the enacting clauses of a statute are of doubtful import (and this is not to say that such is the case here), resort may be had to the title in aid of the discovery of the legislative intent. *Pancoast v. Director General of Railroads*, 95 *N. J. L.* 428 (*E. & A.* 1921); *Paul v. Gloucester County*, 50 *N. J. L.* 585, 589 (*E. & A.* 1888). This, in accordance with *Article* IV, *Section* VII, *paragraph* 4 of the 1947 *Constitution*, providing that "* * * every law shall embrace but one object, and that shall be expressed in the title." By force of this provision, "the title of a statute is not only an indication of the legislative intent, but is also a limitation upon the enacting part of the law"; it "can have no effect with respect to any object that is not expressed in the title." *Hendrickson v. Fries*, 45 *N. J. L.* 555, 563 (*E. & A.* 1883); *Gibbs v. Township Committee of Northampton Township*, 52 *N. J. L.* 496 (*Sup. Ct.* 1890); *Dobbins v. Northampton*, 50 *N. J. L.* 496 (*Sup. Ct.* 1888).

It is particularly significant in this regard that the embodiment of this provision was by means of a supplement to *chapter* 12 by a title that included "other crossings." A supplement is in its very nature a complement or addition to the original statute. *Packard v. Bergen Neck Ry. Co.*, 54 *N. J. L.* 229 (*Sup. Ct.* 1892); *Edwards v. Stein*, 94 *N. J. Eq.* 251 (*Ch.* 1922). "The ordinary meaning of the word 'supplement' doubtless is 'a supplying by addition of what is wanting' "; but usage has given the term a special and broader meaning. *Rahway Savings Institution v. City of Rahway*, 53 *N. J. L.* 48 (*Sup. Ct.* 1890). "A supplemental act is one designed to improve an existing statute, by adding something thereto without changing the original text." *First State Bank of Shelby v. Bottineau County Bank*, 56 *Mont.* 363, 185 *P.* 162, 8 *A. L. R.* 631 (*Sup. Ct.* 1919). A supplemental act "is that which supplies a deficiency, adds to, or completes, or extends that which is already in existence, without changing or modifying the original." *McCleary v.*

*Babcock,* 169 *Ind.* 228, 82 *N. E.* 453 *(Sup. Ct.* 1907). "Supplementary" means added as a supplement; additional; being, or serving as, a supplement. *Swanson v. State,* 132 *Neb.* 82, 271 *N. W.* 264, 268 *(Sup. Ct.* 1937). The term "supplemented" is frequently used "in apposition to the term 'amended' to designate the legal effect of an ordinance subsequently adopted adding to the provisions of the original ordinance without making any changes in its phraseology or effect." *Lehman v. McBride,* 15 *Ohio St.* 573 *(Sup. Ct.* 1863) ; *City of Cincinnati v. Hillenbrand,* 103 *Ohio St.* 286, 133 *N. E.* 556 *(Sup. Ct.* 1921) ; *Caldwell v. Cleveland,* 12 *Ohio N. P., N. S.,* 483, 24 *Ohio Law Abs.* 233 (1937). A "supplementary" or "supplemental" act is generally "an act not purporting to amend but which makes an addition to a prior statute without impairing any existing provision thereof." *Sutherland's Statutory Construction,* 3d ed., *section* 1924.

*Subdivision B* of *chapter* 12, *R. S.* 48 :12–68 to 78, covers all State highway-railroad intersections; and, as we have seen, *R. S.* 48 :12–68, the jurisdiction of the State Highway Commission also extended to improvements, alterations and reconstruction of crossings not at grade, and new crossings not at grade in replacement of grade crossings in the vicinity. Hence, the express limitation of *section* 2 of the 1947 act to secondary highway-railroad intersections, as a means of placing all highway-railroad intersections in the one category in respect of sharing the expense of grade separation improvements and reconstructions.

*Section* 2 of the 1947 act was given the compilation number 48 :12–67.1 by the Law Revision and Bill Drafting Commission pursuant to *R. S.* 1 :3–1, as amended by *L.* 1941, *c.* 19. *Section* 48 :12–67 provided that *sections* 48 :12–61 to 48 :12–66 should apply to "any alterations, changes, relocations or openings" ordered by the Board prior to April 14, 1930, if no part of the work under such order had been actually commenced. There was no mention here of "reconstructions."

The Attorney-General invokes the purely interpretive

doctrine that repeals by implication are not favored in the law; and, absent an express repealer, the indication of an intention to effect a repeal of prior legislation must be clear and compelling. Since the question is essentially one of legislative intent, it follows that where, as here, the later statute is manifestly intended to prescribe the exclusive governing rule, it necessarily supersedes the prior inconsistent legislation. *Town of Montclair v. Stanoyevich,* 6 *N. J.* 479, 494 (1951). And even where the two laws on the same subject "are not repugnant in terms, yet if the later act covers the whole subject matter, and it appears that it was intended as a substitute for the first act, it will operate as a repeal of that act." *Roche v. Mayor and Council of Jersey City,* 40 *N. J. L.* 257 (*Sup. Ct.* 1878). To the same effect: *Hartman v. Board of Chosen Freeholders,* 127 *N. J. L.* 170 (*Sup. Ct.* 1941). See also *Hourigan v. North Bergen Township,* 113 *N. J. L.* 143 (*E. & A.* 1934).

A statute is not to be given an arbitrary construction, according to the strict letter, but such as will advance the sense and meaning fairly deducible from the context. The reason and spirit of the law, *i. e.,* the motive which led to the making of it, prevails over the literal sense of terms; its obvious policy is an implied limitation of the sense of general terms and a touchstone for the expansion of narrower terms. Words are but symbols of thought and expression which of necessity take color and significance from their surroundings and the evident purpose of the law. *Fischer v. Fischer,* 13 *N. J.* 162 (1953). Reason is the soul of law; the reason of the law being changed, the law is also changed. 7 *Coke* 7. And where the reason of the regulation is general, though the provision is special, it has a general acceptation. *Wright v. Vogt,* 7 *N. J.* 1 (1951). The end design of construction is to bring the operation of the statute within the apparent intention of the Legislature. *Nagy v. Ford Motor Co.,* 6 *N. J.* 341, 350 (1951).

Neither the collocation of words and phrases of the act nor the rules of syntax should control in disregard of the

evident legislative intent. *Costanzo v. Tillinghast,* 287 *U. S.* 341, 53 *S. Ct.* 152, 77 *L. Ed.* 350 (1932). The dominant consideration is the sense and meaning of the statute when read as a whole, and regard is to be had to the subject matter as well as the language. *Bayonne Textile Corporation v. American Federation of Silk Workers,* 116 *N. J. Eq.* 146 (*E. & A.* 1934). And to this end, it is proper to consider the history of the times and the attending circumstances when the act was adopted, including the social, economic and governmental conditions of the State or country. *District of Columbia v. Murphy,* 314 *U. S.* 441, 62 *S. Ct.* 303, 86 *L. Ed.* 329 (1941). If the intent of the Legislature cannot be gathered from the statute itself, taken as a whole, resort may be had to such extrinsic matters as the Legislature presumably had in mind at the time of the adoption of the law. *In re Taft's Estate,* 110 *Vt.* 266, 4 *A. 2d* 634, 120 *A. L. R.* 1382 (*Sup. Ct.* 1939). Chief Justice Marshall said: "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived." *United States v. Fisher,* 2 *Cranch* 358, 2 *L. Ed.* 304 (1804).

The majority view is that the "role of *section* 2 [of the 1947 Act] was merely to spell out the effective date of the new 85–15 formula and nothing more."

But, as plaintiffs acknowledge, and quite properly so, the normal course to this end would have been the amendment of the Act itself. The argument is that the unconventional supplement served the selfsame purpose, thus ignoring the apparently discriminating use of both the amendment and the supplement in the one Act. It is fairly to be presumed, barring a clear showing *contra,* that in such context the supplement was employed in its conventional usage as a complement or addition to the original Act. Manifestly, these were not used casually as convertible terms; the frame of the Act itself denotes beyond reasonable doubt their purposive use as words of art having essentially different connotations.

And the absence of a specific appropriation is of no significance as to the legislative meaning and purpose; to hold the contrary is to beg the question. There was no current need for an appropriation to fulfill the statutory purpose. The elimination of existing grade crossings was then and still is a continuous process according to an "annual program" that requires annual appropriations. But such is not the case in the reconstruction of grade separations; the need here is not continuous but sporadic, and appropriations may be made as the intermittent need arises. It is shown that since 1930 there were but seven reconstructions of local highway-railroad crossings not at grade, and the entire cost of at least three of these projects was borne by the State's allotment of Federal funds supplied by the Works Progress Administration. And it was conceded on the oral argument that, although not wholly sufficient, the State Utility Commission was then in possession of moneys that could be devoted to this purpose, if the obligation were the State's in part, presumably undedicated funds usable for general purposes.

But however this may be, the want of an appropriation cannot be determinative of the meaning of the Act, especially in this context; if the apportionment is provided as of right, then the full burden cannot be cast upon the railroad because the State's share is now unavailable. There is quite obviously no need for an annual appropriation to this end, unlike the elimination of existing grade crossings according to an annual program; and it is but fair to assume that the Legislature deemed it prudent economy to await the need from time to time, irregular as it must necessarily be.

And it is purely conjectural to suppose that the insertion of the word "reconstructions" in *R. S.* 48:12–62, by the amendment effected by *section* 1 of the 1947 Act, was designed "to avoid any possible contention that the 85–15 formula would be inapplicable * * *." There had been no doubt as to the meaning of the section in all the years of its operation. The words "alterations, changes, relocation

or opening" amply conveyed the sense which it is now thought was merely restated by the addition of the term "reconstructions," and this by common consent over the years; and so it is sound hypothesis that the purpose was to relate the section to an expanded coverage of the new cost-sharing formula; there is no other reasonable alternative. The suggestion of simple clarification overlooks the significance of the terms "changes" and "relocation," not to mention "opening."

The proposal here is a new bridge to replace the 1901 structure now outmoded and inadequate for the ever-increasing flow of motor vehicle traffic, generally such in character and volume as to demand new highways and expansion of the old, an apt illustration of the design of the supplement to place all crossing reconstructions and improvements to satisfy modern requirements in the one category. The need for the new overpass grew out of the necessitous conditions now obtaining.

It would seem to be a distortion of the essential reason of the legislative policy to hold that, as to secondary grade crossings, the cost of crossing separations alone is shared, even though the replacement be a substantial extension of the old construction, required in the imperative public interest to meet the great and continuing increase in the volume of traffic different in character. And on this general hypothesis, the statute in terms covers all secondary crossing reconstructions, whether or not at grade. Such is the obvious principle of the legislative policy.

I am clear that the Legislature intended to deal with the problem in principle as in the Federal jurisdiction and other states; and that this intent is evident in the expression.

I would reverse and remand for judgment accordingly.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS and PROCTOR—4.

*For reversal*—Justices HEHER, WACHENFELD and FRANCIS —3.