[No. 17687.   Department Two.   September 13, 1923.]

JOHN SMITH COMPANY, *Appellant*, v. WALTER T. HARDIN *et al., Respondents.*[1]

CHATTEL MORTGAGES (49, 60)—RIGHTS AND LIABILITIES—SALE OF PROPERTY BY MORTGAGOR — AUTHORITY TO SELL — EVIDENCE — SUFFICIENCY. Findings that an officer of a corporation holding a chattel mortgage on a lessee's crop of wheat, authorized the lessee to sell the crop and straighten up his debts, are not sustained, where the only evidence thereof is the testimony of the lessee that such authority was given him over the telephone, and that his wife, a telephone operator, overheard the telephone conversation, the company not being indebted to the lessee and there being no liens or claims asserted against the crop, or any reason for the company to straighten up the lessee's debts.

Appeal from a judgment of the superior court for Franklin county, Truax, J., entered July 8, 1922, in favor of the defendants, in an action to foreclose a chattel mortgage, tried to the court. Reversed.

*Chas. W. Johnson,* for appellant.

*E. M. Gibbons,* for respondents.

TOLMAN, J.—Appellant, as plaintiff, instituted this action to foreclose a chattel mortgage, duly filed for record, covering farming equipment and a crop grown in the year 1920. Respondent Kerr-Gifford Company was made a party upon the theory that it had obtained possession of the wheat covered by the mortgage. From a decree denying relief as against Kerr-Gifford Company, the plaintiff has appealed.

[1] Reported in 218 Pac. 2.

The question here is whether respondent Kerr-Gifford Company can be held accountable for the mortgaged crop which it received, and, as we view it, is a question of fact only.

It appears that John Smith, as an individual, leased certain farm land owned by him to respondents Hardin Brothers, reserving one-third of the crops to be raised as rental, as evidenced by a written lease. At about the same time, the lessees, having purchased the farm equipment, gave a chattel mortgage to John Smith Company, a corporation, on the personal property used on the farm, and on all crops to be grown during the season of 1920, to secure the payment of $8,579, with interest, "and also as security for the payment to the mortgagee of all advances hereafter made by the mortgagee to the mortgagors in money, supplies or merchandise, not exceeding the sum of $5,000, the amount of which may be ascertained at any time by inquiry from the mortgagee." Such advances were made in considerable amounts at intervals from December, 1919, to May, 1920, and there is no controversy upon this point. Kerr-Gifford Company admit the purchase of the mortgaged wheat from the tenants, and allege the payment of the full purchase price, except as to a small portion, to the tenants, and seek to justify that action upon the theory that the lessor, John Smith, who was also the president and general manager of the John Smith Company, a corporation, authorized the tenants to make the sale and receive the purchase money. Before the case came on for trial, John Smith died, and upon the trial the respondent Walter T. Hardin was called by the plaintiff as a witness and testified to having sold and delivered the wheat to Kerr-Gifford Company, and on cross-examination he testified:

"Q. How did you happen to sell it to Kerr-Gifford Company? A. I sold it to straighten up the debts of the ranch. Q. Upon whose instructions did you sell it? A. John Smith's, at Walla Walla. Q. Did he tell you to sell that wheat? . . . . A. Why, Mr. Smith—I went to see him about selling the wheat and he told me to go ahead and sell the wheat and straighten up the bills at the ranch; sell my part, and he afterwards gave me permission to sell his part also. Q. That conversation you had with John Smith, was any of it over the telephone? A. The last part of it. Q. What part was that? A. I had contracted my wheat and at the time I sold I was closing the deal, and I called him and asked him if he wanted to turn his part of it at the same price as I had sold mine in the contract, and he told me he would be very glad to do that, to go ahead and sell the wheat and straighten up. Q. Straighten up what? A. Straighten up the bills. Q. And that conversation was over the telephone between you and John Smith? A. Yes, sir."

This testimony was reiterated when Hardin was called on behalf of the defense, and was sought to be corroborated by the testimony of the wife of Walter T. Hardin, who, in effect, said that she became Mr. Hardin's wife on July 29, 1921; that, before that time, and during the summer and fall of 1920, she was toll operator for a telephone system at Pasco, and at that time she overheard a long distance telephone conversation between Walter T. Hardin and John Smith, the substance of which she states to be as follows:

"Mr. Hardin called Mr. Smith and he told him that he didn't have enough wheat to fill his contract and asked him if he would like to have him turn in his, Mr. Smith's wheat to fill the contract at the price that he had it contracted for, and Mr. Smith says, 'Yes sir, go ahead and straighten up the bills.'"

This is the only direct evidence in the case with reference to authority being given the tenants to dispose of the mortgaged wheat. There was testimony offered

on behalf of the appellant in rebuttal to the effect that the corporate records of John Smith Company show no record of any such authority having been given.

The case was tried to the court without a jury, and as is usual in such cases, the court was liberal in admitting testimony, and much that was inadmissible was admitted, but apparently not considered by the trial court in reaching a determination of the issues. The trial court in a memorandum opinion said:

"All the affirmative testimony which the court has a right to consider is to the effect that John Smith as manager of the plaintiff corporation gave the defendant Walter T. Hardin authority to sell the plaintiff's interest in the wheat crop, and to apply the proceeds in discharging expenses of the ranch. Walter T. Hardin states positively that this authority was given to him by Mr. Smith at Walla Walla some time between August 30th and September 10th. Mrs. Walter T. Hardin claims that she was employed as a telephone operator during the same summer and that prior to her marriage to the defendant, at which time there was a conversation by telephone between Walter T. Hardin at Connell and John Smith at Walla Walla, Mr. Smith told Mr. Hardin by telephone to sell the plaintiff's share of the wheat and pay the bills. . . . . The testimony of Mrs. John Smith to the effect that no corporate records were in existence showing any authorization to defendants Hardin to dispose of plaintiff's interest in the crop is but negative in its nature and neither proves nor disproves anything, for the reason that John Smith as general manager of the plaintiff, by virtue of his authority as such officer, had a right to direct a sale of the mortgaged crop as well as a disposition of the proceeds without any directions from the stockholders or board of directors. . . . . And in the present case, the court would not be justified in disregarding the positive testimony of two witnesses whose statements stand uncontradicted, and opposed to which the only evidence in the record competent to be considered concern the alleged suspicious circumstances regarding the absence of Walter T.

Hardin from the state soon after the sale had been consummated."

All too frequently we are called upon to consider cases where we suspect, and sometimes are morally certain, that false testimony has been given, and, notwithstanding, we are obliged to say that the jurors are the judges of the credibility of the witnesses, and therefore we cannot interfere. Fortunately, or otherwise, this case was tried to the court sitting without a jury, and we are privileged to pass upon the weight of the evidence. We have considered this testimony in every light and from every standpoint conceivable by us, and, though we realize that it is a serious matter to brand as perjurers witnesses whom we have not seen, and whose testimony comes to us in cold type, yet we would perform less than our duty and become, in a sense, parties to the wrong, if we let a judgment based on false testimony stand.

John Smith, we must presume, in the absence of evidence to the contrary, was, at the times referred to, in full possession of his mental faculties, and there is no attempt to show that he was deceived or misled by any false representations as to the facts. It does not appear that there were any liens or claims asserted against the wheat by third parties, and no reasons whatever are advanced tending to show why any sane man would, under such circumstances, deliberately give away his own substance and that of a corporation of which he was an officer, and to whose stockholders he was responsible, to one to whom he owed nothing and was under no obligation. This view is greatly emphasized by testimony volunteered by Hardin to the effect that, under the mortgage providing for advances, he was refused further advances requested by him after May, 1920, and told, in effect, that he must thereafter finance himself.

Had the witness Hardin testified that John Smith told him to sell the wheat and remit or bring the money to him at his place of business in Walla Walla, there would have been some plausibility to the argument that he trusted Hardin, but the testimony is that Smith told Hardin to sell the wheat and use the proceeds in paying the debts of Hardin Brothers, for which neither Smith nor the appellant corporation were in anywise liable, and this is too much for human credulity. Sane men do not do such things in that way. To illustrate; suppose Hardin had gone to Kerr-Gifford Company and said: "Smith owns one-third of this wheat, and John Smith Company has a chattel mortgage on the remaining two-thirds of it. John Smith has told me to sell it and take the proceeds to pay my debts. Please take it and give me the money." Would Kerr-Gifford Company, or any other business firm, have accepted and acted upon such an unsupported statement? By no means. Its officer or agent would have said: "You must secure written authority from Smith, and a release of the mortgage, or written authority to sell from his corporation before we can pay you the money," and nothing Hardin could have said, even though corroborated by his wife, would have changed that attitude.

It is quite the usual thing, when manufactured testimony is offered, to seek to give it some form of corroboration, and listening in on a telephone conversation is a popular method. This feature, therefore, lacks even the virtue of novelty and confers an added earmark of the falsity of the whole story.

What we have said is probably sufficient, but in addition, reading between the lines of the trial court's memorandum opinion, it seems to us to say that he was impressed with the idea that the testimony referred to did not speak the truth; but because it was the only testimony in the case it must be accepted. Such is not

the rule. No right should be established or denied by the solemn judgment of a court except such as is warranted by the convincing weight of the testimony. The testimony to which we have referred is contrary to all human experience, and has no convincing weight. Therefore judgment should have been entered against the respondent Kerr-Gifford Company for the value of the mortgaged wheat, which it admittedly received.

Reversed, with directions to enter judgment in accordance with the views herein expressed.

MAIN, C. J., FULLERTON, PEMBERTON, and PARKER, JJ., concur.