LACHER, et ux. *v.* BOARD OF TRUSTEES OF THE STATE COLLEGES

[No. 106, September Term, 1966 (Adv.).]

502

[redacted]

*Decided July 20, 1966.*

[redacted]

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER and MCWILLIAMS, JJ., and EVANS, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*M. Peter Moser,* with whom was *Berryl A. Speert* on the brief, for appellants.

*Alan M. Wilner, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Morton A. Sacks, Assistant Attorney General,* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

This case involves the validity of a proposal by the Board of Trustees of the State Colleges to pledge certain revenues (student fees) from existing buildings at two of the State Colleges for the payment of the interest and principal of revenue bonds to be sold to raise money to build new dormitories at those two colleges.[1]

---

1. Until 1963 the management and control of the then State Teachers Colleges were vested in a Board of Trustees composed of the State Board of Education and the State Superintendent of Schools. By Section 2 of Ch. 41 of the Laws of 1963 (which added new sections 164 and 165 to Article 77 of the Code), the Legislature created a new Board of Trustees consisting of eight citizens of the State and the State Superintendent of Schools to run the five

The State traditionally has paid the cost of building facilities for the State Teachers Colleges, including residence halls. However, in his budget message of 1965 to the General Assembly, Governor Tawes said that the State no longer would be able to provide funds for the construction of dormitories, dining halls and student activity buildings at the Colleges.

On January 12, 1965, the Director of the Planning Department of the State wrote the Board of Trustees of the State Colleges:

> "After careful consideration, it was decided that State funds would not be provided for the construction of a dormitory at either [Frostburg or Salisbury] * * *. Many reasons support this decision. The capital needs study which was recently completed disclosed that during the next 10 years, rising enrollments will necessitate capital expenditures by the State in the amount of $82,000,000 for academic facilities only. And this does not include essential ancillary projects which will be necessary to make those facilities usable, such as power supply, heat, water and other utilities, roads, walks, and parking areas. Moreover, we cannot overlook the equally pressing demands for facilities in other areas of State activity such as mental health, welfare and others—none of which can be neglected.
>
> "It has become quite apparent that the State will no longer be able to afford to provide funds for the construction of dormitories, dining halls, and other auxiliary facilities. Rather than being heavily subsidized by

colleges then called Teachers Colleges. By Section 165(a) the new Board was given "all the powers, rights and privileges attending the responsibility of their management, * * * [and] of all the real and personal property and all the monies of the State colleges * * *. In Section 165(f) the Board was directed to maintain the existing program for the preparation of teachers and also "take all steps necessary and desirable to establish full four-year courses of instruction in the arts and sciences in the State colleges where such programs are not now offered, and to foster and expand such programs where already established."

504

the State, as in the past, such facilities must be put on a self-supporting basis. There are other means available for financing such projects, for example, Federal loans, and various lease and lease-purchase arrangements."

The new Board pondered the facts that at Frostburg State College enrollment had increased from 367 in 1952 to 1650 in 1965 and that in the same period the number of students living in the residence halls at the college rose from 95 to 649, and that it was estimated that by 1976 enrollment would total 3444, as well as the comparable figures at Salisbury State Teachers College—233 students in 1952 (169 in residence) and 678 in 1965 (392 in residence) with 2612 estimated for 1976—and concluded, quite understandably, that despite the cessation of flow of State funds, new residence facilities must be built. The Board canvassed the possibility of private capital building the facilities but found that it, as a State agency, could build the dormitories more cheaply by the use of tax exempt revenue bonds because a private builder must pay more for the money he would use to build and also seek to make a profit. It also found that to make the bonds salable at an economically practicable rate of interest sources of revenue to repay them above the fees from the buildings to be constructed must be provided. The Board then decided to ask the Legislature for express authority to issue revenue bonds to produce funds for the building of new facilities. The Legislature responded by the passage of Ch. 739 of the Laws of 1965 which authorized the Board (by ten new sections added to Art. 77 of the Code, to be known as Sections 165A to 165J, inclusive) to, in the accurately descriptive words of the title:

"construct, equip, maintain and operate one or more buildings to provide additional housing facilities, living accommodations, and facilities, including recreational and eating facilities, authorizing the said Board of Trustees to impose fees, rents and charges for the use thereof and for the use of similar existing facilities under its direction and control, and authorizing the said Board of Trustees to issue revenue bonds to pay

the cost of all or any part of such project or projects, the principal thereof and the interest thereon to be payable solely from the fees, rents and charges for the use of the facilities provided by the buildings constructed with the proceeds of said bonds and for the use of similar existing facilities under the direction and control of said Board of Trustees except for interest prior to, during and for one year after completion of construction, providing that interest during such period may be paid out of bonds proceeds and/or out of such other moneys as may be allocated for such purpose, and providing that the said bonds in no way be the debt or obligation of the State of Maryland or any subdivision thereof, except said Board of Trustees, and exempting said bonds from taxation, and relating generally to additional housing facilities and the issuance of revenue bonds to pay the cost of all or any part of the same."

The Board by resolution has indicated that it intends to utilize the authority of Ch. 739 to issue $2,000,000 of revenue bonds to build a new dormitory at Frostburg and a new dormitory at Salisbury. Bond counsel advised the Board that the provisions of Sec. 165C (f) of Ch. 739, that the Board:

"may increase from time to time, fees, rents and charges for the use of any existing housing unit or existing housing units at any of the public colleges under the direction and control of said Board of Trustees and may designate and pledge all or any part of such increase in such fees, rents, charges and other revenues from any such existing housing unit or existing housing units, as additional security for the bonds authorized by Sections 165A-165J, inclusive, of this sub-title. The fees, rents, charges and revenues so designated and pledged as additional security shall be subject to any pledge or assignment provided in any trust agreement entered into pursuant to Section 165D of this sub-title and shall be treated in all respects the same as provided in Sections 165A-165J,

> inclusive, of this sub-title for fees, rents, charges and revenues received from the use of the housing unit or housing units constructed from the proceeds of the bonds issued under the provisions of Sections 165A-165J, inclusive, for this sub-title,"

were of doubtful validity and required a test case to establish the legality of the revenue bonds authorized by the resolution. Such a case was arranged and appellants, residents, voters and taxpayers of Maryland sought (1) a declaration that Ch. 739 of the Laws of 1965 and the resolution of the Board to proceed thereunder were null, void and of no effect because they purport to authorize the Board to create a debt of the State not meeting the requirements of Section 34 of Art. III of the State Constitution, and (2) an injunction forbidding the Board "to take any action pursuant to the purported authority of Chapter 739 or the resolution."

In a thorough and competent opinion, Judge Harris dismissed the bill for declaratory and injunctive relief, finding that the proposed revenue bonds would not constitute an indebtedness or obligation of the State or of any political subdivision of the State within the meaning of Section 34 of Art. III of the Constitution of Maryland. We think that he was right.

The conténtions of the appellants are (1) that the first sentence of Section 34 of Art. III requires any "debt" contracted by the General Assembly to be paid from "an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to pay the principal thereof within fifteen years from the time of contracting the same"; (2) that a "debt"—within the constitutional meaning of Sec. 34—is created if there is a pledge of existing State property or the income from existing State property; (3) Ch. 739 authorizes the issuance of bonds, the interest and principal of which are to be paid in part from increases in fees from existing State properties; and (4) since Ch. 739 permits bonds to be issued with maturities of up to forty years the requirements of Sec. 34 are not met.

Appellants concede that Maryland, in company with almost all jurisdictions that have considered the matter, holds that a State debt is not created by the issuance of bonds that are to be repaid from funds, not taxes, flowing solely from the facil-

ity to be created by the proceeds of the bonds, as long as there is no pledge of existing State property and no pledge of income from existing State property, *Wyatt v. State Roads Comm.,* 175 Md. 258, 266 (finding legal, as not a debt of the State, bonds sold to construct bridges to be paid from tolls—"There is a large volume of cases which have decided that no debt, in the constitutional sense, is created by issues of bonds payable out of revenues, only a very few courts having come to a contrary conclusion, and some of those courts having subsequently adopted the view of the majority. See studies in 43 Yale Law Journal, 924, 953; 4 Fordham Law Review, 12; 47 Harvard Law Review, 688; and 84 Univ. of Pa. Law Review, 555"). This view is known as the Special Fund Doctrine. See Chermak, The Law of Revenue Bonds 88-92 (1954), and cases cited. The author says:

> "The Special Fund Doctrine has application where the obligation incurred is payable wholly out of the income and revenue of the enterprise which it finances. These revenues provide a fund out of which the revenue bonds are paid, and no other funds of the governmental unit subject to the debt limitation avoided, may be pledged to pay such special obligations.
>
> "The Special Fund Doctrine has been tested in relation to the issuance of revenue bonds by municipalities in all the states having constitutional municipal debt limits, and has been accepted in its broadest aspects in 27 of these states."

Some thirty cases are cited in support of these statements. Ten other states have no constitutional prohibition requiring the application of the doctrine or expressly permit it. See also Williams and Nehemkis, "Municipal Improvements as Affected by Constitutional Debt Limitations," 37 Colum. L. Rev. 177, 188-90 (1937).

Appellants' contention that the pledge of revenues from existing buildings contaminates the purity of the Special Fund Doctrine and makes the financing under Ch. 739 a debt of the State is based on language in *Baltimore v. Gill,* 31 Md. 375.

In *Gill* the Court held that the pledge by Baltimore City of such number of valuable income-producing shares of stock of the Baltimore and Ohio Railroad Company as might be necessary to raise $1,000,000 to be invested in bonds of the Western Maryland Railroad Company created a debt of the City (in that it was a borrowing to be expended in the construction and equipment of the Western Maryland Railroad) contrary to the provisions of law controlling the creation of debt by the City. The Court said that the applicable constitutional provisions were intended to restrain the City from borrowing money "except for the purposes and in the manner prescribed, either upon the general credit of the city, or by a pledge of its revenues or assets"; the Court *held* that borrowing a million dollars "upon the pledge of valuable property, or assets, held by the city" created a debt of the City.

*Gill* has been limited in its effect by later cases to its precise holding that a pledge or mortgage of existing governmental property creates or constitutes a debt. *Wyatt, supra* (revenue bonds financed by future tolls not a debt) ; *Lerch v. Md. Port Authority,* 240 Md. 438, 452-62 (the use of $1,000,000 of its assets by the Port Authority of Baltimore, a State agency, to add to proceeds of revenue bonds to be sold to build an International Trade Center and subjecting the Center when built to a lien to secure the bonds was not a contracting of debt by the State). See also *Castle Farms, Etc. v. Lex. Mkt. Auth.,* 193 Md. 472, and *Johns Hopkins Univ. v. Williams,* 199 Md. 382.

Limiting *Gill,* as have prior cases, as holding no more than that the creating of a lien on existing property to secure a borrowing of money creates a debt by the borrower, we think it is not a bar to a finding that the pledge of non-tax revenues from an existing facility towards the payment of revenue bonds issued by an agency of the State is not in itself the creation of a debt by the State.

Almost all of the many states which have adopted the Special Fund Doctrine have reached a similar conclusion and have held the pledge of future revenues by a state agency from an existing enterprise or building to sweeten the pot available from the future revenues from the facility or building to be con-

structed from the proceeds of revenue bonds does not amount to the creation of a debt by the state. *Button v. Day* (Va.), 130 S. E. 2d 459; *Button v. Day,* 139 S. E. 2d 838; *Conder v. University of Utah* (Utah), 257 P. 2d 367; *Iowa Hotel Association v. State Board of Regents* (Iowa), 114 N. W. 2d 539; *State of West Virginia v. O'Brien* (W. Va.), 94 S. E. 2d 446; *State v. State Board of Education* (Mont.), 34 P. 2d 515, 519; *Arnold v. Bond* (Wyo.), 34 P. 2d 28; *State v. Regents of University of New Mexico* (N. Mex.), 258 P. 571; *Fanning v. University of Minnesota* (Minn.), 236 N. W. 217; *Caldwell Bros. v. Board of Sup'rs* (La.), 147 So. 5.

In *Wyatt* this Court, without so categorizing it, sanctioned the Special Fund Doctrine where there was a pledge only of future revenues from the facility to be built from the proceeds of the revenue bonds to be sold by the State Roads Commission. We see no persuasive reason why the extension of the Special Fund Doctrine (now largely held to be an inherent part of the doctrine) that regards the pledge of revenues from existing buildings as not creating a debt should not be followed and applied here — and if all the revenues from an existing building can be so pledged, obviously increases in such revenues can be, as the Supreme Court of Virginia held in the first *Button* case, 130 S. E. 2d 459.

Section 165C(e) of Ch. 739 expressly declares that the revenue bonds under consideration shall not be, create or constitute a debt or obligation of the State or of any of its political subdivisions, except of the Board, and requires that the bonds so state on their faces. Section 165D forbids the conveyance or mortgaging of the buildings of the colleges (which are to be the property of the State) and limits the security or collateral for the bonds to fees, rents and charges from the buildings to be erected and increases in fees from existing buildings.

The contract between the Board and the bondholders will necessarily embody these provisions and limitations, and a debt or obligation of the State could result only if the pledge of the increase in revenues from existing buildings created or constituted such a debt. The appellants point out that (1) fees from existing buildings now can be and are used for maintenance of the buildings of the State Colleges and any excess

not so needed would revert to the State treasury, and (2) after the bonds are sold increases in fees from existing buildings will be irrevocably diverted to support the bonds and will be unavailable to maintain the buildings or for other State uses, with the result that State tax revenues not now so used will have to be expended in the future for maintenance. They earnestly urge us to join a small minority of courts which hold that the divestiture of special funds to a particular use and the need to replace them with tax monies creates a debt, holdings which are sometimes referred to as the Limited or Restricted Special Fund Doctrine—see Chermak, The Law of Revenue Bonds 92-95, and Williams and Nehemkis, "Municipal Improvements as Affected by Constitutional Debt Limitations," 37 Colum. L. Rev. 177, 192-97 (1937), and cases such as *Boe v. Foss* (S. D.), 77 N. W. 2d 1; *Wilder v. Murphy* (N. D.), 218 N. W. 156, and *Opinion to the Governor* (R. I.), 181 A. 2d 618. We do not find the reasoning and conclusions of the few cases such as these persuasive. The courts of several states which originally embraced the Limited or Restricted Special Fund Doctrine later rejected it and have come over to the majority view.[2]

Factually, it is stipulated in the present case that the State now pays much of the maintenance cost of existing buildings at the State Colleges. These costs are called direct and include salaries, contractual services and supplies, replacement and new equipment, and applicable social security, pension and workmen's compensation costs. Indirect costs, paid by the colleges from the fees, include student help, utilities, supplies for repairs and services and household supplies, as well as pro-rated salaries of plant operation and maintenance personnel. Total of both direct and indirect costs at Frostburg, for example, was

---

2. In Illinois, City of Joliet v. Alexander, 62 N. E. 861, was overruled on the point by Ward v. City of Chicago, 173 N. E. 810 (see Annot., 146 A. L. R. 328, 345), and in Missouri, Bell v. City of Fayette, 28 S. W. 2d 356, was overruled on the point by Grossman v. Public Water Supply Dist. No. 1, 96 S. W. 2d 701. A discussion of these cases and the desertion of the Limited or Restricted Special Fund Doctrine by other courts is to be found in Chermak, The Law of Revenue Bonds 92-95.

estimated for 1966 at $312 per student and divided into $146 direct and $166 indirect. By 1975 it was thought the total would be $381 per student, with $179 direct and $202 indirect.

The obligation of the State to maintain the buildings at the State Colleges in the future is exactly that it has to maintain any buildings it owns and that of any provident owner of property. It has not agreed with the bondholders or with any one else to pay any amount in future years to maintain any building. Whether it does maintain them depends on whether the Legislature appropriates the necessary funds, and it cannot be forced to authorize such expenditures. An obligation of this sort is not in our view a debt within the meaning of the Constitution. Even if the State had covenanted with the bondholders to maintain the buildings, now existing or to be built, the contractual obligation to maintain would not be a debt in the constitutional sense under *Wyatt*. There the State Roads Commission, as the enabling legislative act had authorized, covenanted with the prospective revenue bondholders to maintain with general State funds the bridge the proceeds of the bonds were to build. The Court said at pp. 267-68 of 175 Md.:

> "But the bridges are to belong to the State from their beginning, and in this the State undertakes only its ordinary function with regard to its highways, to be paid for as a current expense of government. If it should buy or build a bridge, paying for it at once from money in the treasury or money borrowed as usual, it would take up this duty of maintenance, repair, and operation at once from its current funds, and, however great the burden might appear to be, it would not be said that a debt in the constitutional sense, that sort of debt which caused the insertion of this constitutional clause, had then been contracted. The added element of contract with the bondholders would add nothing to the State's ordinary burdens. * * *
>
> "The Constitution does not prohibit all burdens, or require all contracts of the State, to be accompanied by laws for levies of taxes to meet them. It deals with

burdens of a kind. And an undertaking to pay undetermined, undeterminable, amounts of the cost of maintenance, repair, and operation in the future from day to day, month to month, and year to year, as need arises, if it can be classed as containing an element of debt at all, is not one for which taxes to pay interest and principal, and to pay the principal completely in fifteen years, might be provided in a tax law. There can be no principal and interest in such a contract obligation. If it should be met out of the general road maintenance funds it would be, more exactly, a contract for maintenance, work, and labor. No money at the outset will be owed to any one. Money can become payable only to various persons, at various times, in various amounts, as may be called for by future conditions in the bridges. However heavy the burden might possibly become, the contract to carry it is not such a debt with principal and interest as is dealt with by the Constitution. Whatever debt there might be, would be a debt of the future, and the contract would fall in with the distinction between a debt and a contract to incure future debts. According to all decisions known to us, even if ascertained amounts are now agreed to be paid in the future, as, for instance, rentals, this would not be the contracting of a debt in the constitutional sense."

It is our view that the pledge of increases in revenues from existing buildings or facilities at the State Colleges to aid in the payment of interest and principal of revenue bonds to be sold to provide additional buildings or facilities at those colleges does not create a debt of the State within the meaning of the first sentence of Sec. 34 of Art. III of the Constitution of Maryland.

*Decree affirmed, with costs.*