JOSEPH E. CLAYTON, ACTING COMMISSIONER OF THE NEW JERSEY DEPT. OF EDUCATION AND THE NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY, A PUBLIC CORPORATION AND GOVERNMENT INSTRUMENTALITY IN THE DEPARTMENT OF EDUCATION, PLAINTIFFS-RESPONDENTS, AND ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN NEW JERSEY, PLAINTIFF - INTERVENOR - RESPONDENT, v. JOHN A. KERVICK, STATE TREASURER OF NEW JERSEY, DEFENDANT-APPELLANT, AND HOWARD LEVINE, JACQUELINE LEVINE, JOSEPH MARZELL AND BELLE MARZELL, DEFENDANTS-INTERVENORS.

Argued June 3 and 4, 1968—Decided June 28, 1968.

Mr. *Alfred C. Clapp* argued the cause for the defendant-appellant (Mr. *Arnold K. Mytelka,* of counsel).

Mr. *Stephen G. Weiss,* Deputy Attorney General, argued the cause for the plaintiffs-respondents (Mr. *Arthur J. Sills,* Attorney General of New Jersey, attorney).

Mr. *Clyde A. Szuch* argued the cause for the plaintiff-intervenor (Messrs. *Pitney, Hardin & Kipp,* attorneys; Mr. *Joel A. Wolff,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The defendant John A. Kervick, State Treasurer of New Jersey, appealed to the Appellate Division from a partial summary judgment entered in the Law Division. We certified the matter before argument in the Appellate Division.

In June 1963 Governor Hughes announced the appointment of a committee to review New Jersey's higher education facilities with a view towards overall policy recommendations. In due course, the committee submitted a report which noted that New Jersey's higher education program was "gravely inadequate to meet the needs of its citizens and satisfy the demands of a rapidly growing industrial state." Though the State's educational system was supplemented by what was described as "many fine private colleges," the total picture in higher education was said to remain "woefully deficient when measured against the needs." The committee made many significant recommendations including one which suggested that New Jersey study the possibility of creating an independent Authority, comparable to the New York State Dormitory Authority (N. Y. *Public Authorities Law* § 1675 *et seq.* (McKinney's *Consol. Laws,* c. 43-A, 1957)),

with sufficient power to effectuate expansion projects for both public and private colleges and universities. See *Gen. Stat. Conn. Sec.* 10–335 *et seq.* (1965).

In response to the foregoing, the Legislature enacted the statute which established the New Jersey Educational Facilities Authority. *L.* 1966, *c.* 106; *N. J. S.* 18*A* :72*A*–1 *et seq.* See also *L.* 1966, *c.c.* 107–110. The Authority, which consists of seven members including the Chancellor of the Department of Higher Education and the State Treasurer, *ex officio,* was declared to be a "public body corporate and politic" and an instrumentality exercising "public and essential governmental functions." *N. J. S.* 18*A* :72*A*–4. It was empowered to borrow money and issue bonds which, however, were not to be deemed "a debt or liability of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision." *N. J. S.* 18*A* :72*A*–10. The bonds were to set forth on their face that neither the State of New Jersey nor the Authority shall be obligated to pay them or interest thereon "except from revenues or other moneys of the authority and that neither the faith and credit nor the taxing power of the state of New Jersey or of any political subdivision thereof is pledged to the payment of or the interest on such bonds." *N. J. S.* 18*A* :72*A*–10. It was further provided that the issuance of the bonds "shall not directly or indirectly or contingently obligate the state or any political subdivision thereof to levy or to pledge any form or taxation whatever therefor." *N. J. S.* 18*A* :72*A*–10.

The Authority was empowered, *inter alia,* to construct projects for participating educational institutions and to enter into leasing and subleasing arrangements with self-liquidating goals. Thus section 11 (*N. J. S.* 18*A* :72*A*–11) empowered the Authority to fix rates, rents, fees and charges sufficient with other revenues, if any, to pay the cost of maintaining the project, to pay the principal and interest on bonds issued in connection with the project, and to create and maintain

the reserves required in any resolution authorizing the issuance of the bonds for the project. Insofar as the public colleges were concerned, the Legislature apparently contemplated that projects undertaken by the Authority for them would be in connection with "revenue-producing facilities" such as dormitories, etc.; this is the position taken by the Attorney General and it receives some measure of support from the tenor of the provisions in *N. J. S.* 18*A*:72*A*–26, 27, 27.1. Insofar as the private colleges were concerned, the Authority was broadly empowered to construct projects "for the use and benefit of the participating college and the students, faculty and staff of such participating college." *N. J. S.* 18*A*:72*A*–30. In addition, the Authority was empowered to make loans to private colleges in accordance with *N. J. S.* 18*A*:72*A*–31 through 35.

The 1966 statute creating the Authority appropriated $250,000 to enable it to get under way, and during the following year a similar sum was appropriated by the Legislature. On March 22, 1967 the plaintiff Joseph E. Clayton, Acting Commissioner of Education, addressed a letter to the defendant John A. Kervick, State Treasurer, certifying that the sum of $100,000 was required by the Authority for the preliminary planning of needed projects and requesting that the stated amount be transferred to the Authority. On the following day the State Treasurer denied the request because of his "uncertainty as to the legal and constitutional propriety of the expenditure of public moneys in connection with the contemplated leasing of projects by the Authority to state colleges. (See *McCutcheon v. State Building Authority*, 13 *N. J.* 46 (1953); *Art.* VIII, § II, *paras.* 2 and 3, *New Jersey Constitution* 1947)." He also noted his uncertainty as to the legal and constitutional propriety of the expenditure of public money in connection with any project which involves "the donating of funds, or the providing of any material or services, to private colleges of both denominational and non-denominational character. (See *Art. I par.* 4 and *Art.* VIII, § III, *par.* 3 *New Jersey Constitution*,

and the *First Amendment, Constitution of the United States)."*

After the State Treasurer denied the request for transfer of the funds, the plaintiff Clayton, along with the Authority as an additional plaintiff, filed a complaint seeking a declaratory judgment (*N. J. S. 2A* :16–50 *et seq.*) that the New Jersey Educational Facilities Authority law is valid and constitutional in all respects, and an order requiring the defendant Kervick to take all appropriate actions required of him under the law. Special counsel was appointed to represent Mr. Kervick and leave to intervene as a party-plaintiff was granted to the Association of Independent Colleges and Universities in New Jersey. Leave to intervene as parties-defendants was granted to Howard and Jacqueline Levine and Joseph and Belle Marzell who, as taxpayers, assert the unconstitutionality of the law insofar as it may authorize aid to colleges or universities "under the control or direction of a religious denomination or in which denominational tenets or doctrines are taught." The parties agreed to defer this issue because it requires further factual development, whereas the other issues raised by the defendant Kervick are now susceptible of resolution. To that end they entered into a stipulation which set forth that cross motions were being filed for partial summary judgment with respect to the constitutionality of the Authority's powers regarding "the public institutions of higher education and those private institutions of higher education which are not sectarian." For purposes of the motions alone the parties stipulated that the statute was of no effect "insofar as it authorizes the Authority to enter into programs with private, sectarian institutions of higher education."

The stipulation further set forth that, subject to a favorable judicial determination, the Authority proposed, in the first fiscal year after such determination, to create a debt or debts, liability or liabilities, the total face amount of which "if considered debts or liabilities of the State, will, together with previous debts or liabilities of the State, exceed, in that

fiscal year, one per centum of the total amount to be appropriated by the general appropriation law for that fiscal year." On the basis of the cross motions and the stipulation, the matter was presented in the Law Division to Judge Kingfield. He first noted that the Authority intended to accomplish its purposes through leases, subleases and loan agreements with the various participating institutions; that as each project was approved, bonds would be issued to cover the cost of the particular project with rentals being determined "on the basis of the principal and interest payments required with respect to the bonds," and that the public institutions would expect to pay the rentals "by deriving revenues from such projects" as well as by utilizing, if necessary, other revenues which may become available including any appropriations by the Legislature. He then dealt with the legal and constitutional points raised by the parties and disposed of them in the following manner:

Though he did not consider himself, as the trial judge, free to entertain the Attorney General's request that the holding of this Court in *McCutcheon, supra,* 13 *N. J.* 46, be overruled, he concluded that even within the restrictive principles enunciated there, the Authority's bonds would nuot constitute debts or liabilities of the State and their issuance would therefore not be in violation of the debt limitation clause of the New Jersey Constitution (*Art.* VIII, § II, *par.* 3). He considered that the Educational Facilities law had effectively created an independent body of the nature sustained in *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949), whose debts, particularly in the light of the unequivocally expressed disavowal in the statute and on the face of the bonds, were not debts of the State. He was not at all persuaded by the suggestion that the Governor's power to veto a project (*N. J. S.* 18*A*:72*A*–4), along with the statutory reportage and visitorial provisions (*N. J. S.* 18*A*:72*A*–23), impaired the Authority's autonomy so as to bring the debt limitation clause into play. And he stressed that, unlike the situation in *McCutcheon,* the facilities here

were "meant to pay their way" from revenues obtained mainly from sources other than the State Legislature. See *Petition of Board of Public Buildings,* 363 *S. W. 2d* 598 (*Mo.* 1963); *Application of Oklahoma Capitol Improvement Auth.,* 355 *P. 2d* 1028 (*Okl.* 1960); *Book v. State Office Building Commission,* 238 *Ind.* 120, 149 *N. E. 2d* 273 (1958); *State ex rel Thomson v. Giessel,* 271 *Wis.* 15, 72 *N. W. 2d* 577 (1955); cf. *Opinion of the Justices, Mass.,* 236 *N. E. 2d* 523 (1968); *Lacher v. Board of Trustees of State Colleges,* 243 *Md.* 500, 221 *A. 2d* 625 (1966); *Button v. Day,* 205 *Va.* 739, 139 *S. E. 2d* 838 (1965); *State ex rel. Board of Governors, etc. v. O'Brien,* 142 *W. Va.* 88, 94 *S. E. 2d* 446 (1956); *McArthur v. Smallwood,* 225 *Ark.* 328, 281 *S. W. 2d* 428 (1955); *Conder v. University of Utah,* 123 *Utah* 182, 257 *P. 2d* 367 (1953); *State ex rel. Fatzer v. Board of Regents of State of Kansas,* 167 *Kan.* 587, 207 *P. 2d* 373 (1949); *Jacobs v. Sharp,* 211 *Ark.* 865, 202 *S. W. 2d* 964 (1947); *Geboski v. Montana Armory Board,* 110 *Mont.* 487, 103 *P. 2d* 679 (1940).

In rejecting the contention that the Authority's aid to private nonsectarian educational institutions would violate the constitutional provisions against the State's loan of its credit (*Art.* VIII, § II, *par.* 1) and the donation of land or the appropriation of money by the State to any society, association or corporation (*Art.* VIII, § III, *par.* 3), Judge Kingfield pointed out that a high public purpose was undoubtedly being served by the legislative assistance to the Authority and the educational institutions. He found adequate consideration in the fact that the institutions would be significantly expanding their facilities, thereby increasing the dimension of their services to the public, and he found adequate control in the various terms of the Educational Facilities law and in other statutory enactments governing the licensure and conduct of the colleges and universities operating within the State. See *Roe v. Kervick,* 42 *N. J.* 191 (1964); *Whelan v. New Jersey Power & Light Co.,* 45 *N. J.* 237, 246–47 (1965).

Finally he rejected the suggestion that the law was not severable and that invalidity as to sectarian institutions necessitated a declaration of unconstitutionality as to the entire statute. After referring to the customary severability clause, he concluded his opinion with this comment: "I am inclined to believe that the Legislature dealing with this public purpose of higher education intended the act to operate as far as it could constitutionally be done. Just because it lumped all colleges, public, nonsectarian and sectarian and private colleges into one act shouldn't cause the entire act to fail. I don't see any difficulty in administering the act if any one of the three groups be eliminated. Considering the broad language of the severability clause, it is my conclusion that the act is severable." See *N. J. S.* 18A:76-2; *Group Health Ins. of N. J. v. Howell,* 40 *N. J.* 436, 455 (1963), *s. c.* 43 *N. J.* 104, 114 (1964).

On his appeal from the Law Division's judgment which sustained the constitutionality of the law, the defendant Kervick reasserts before us the several points on which he failed to prevail below. Thus the first point in his brief states that "the Act violates the debt limitation provision of the New Jersey Constitution (Article 8, section 2, paragraph 3)." That paragraph sets forth that the Legislature may not create a debt or liability which, together with pre-existing debts, exceeds 1% of the amount appropriated in the general appropriation act for that year, unless it is authorized by a law which provides the means for payment of interest, and discharge of principal within 35 years, and has been duly approved by a referendum of the people. It was a continuation of the policy of constitutional debt limitation found in *Art.* IV, § VI, *par.* 4 of the Constitution of 1844. The history of the times renders evident the purpose of the 1844 provision. Early in the 19th Century many of the states borrowed for the development of highways, canals and other internal improvements. Business boomed, money was plentiful, and the states had little difficulty in selling their bonds. By 1840 the bonded indebtedness of the states ex-

ceeded the then tidy sum of $200,000,000. However, with the aftermaths of the financial crisis of 1837, the borrowing states found themselves in difficulties and many states defaulted on their bond obligations. See *Dewey, Financial History of the United States* 243 (1934).

In 1842 Rhode Island adopted a constitutional debt limitation and within the next two years New Jersey, although it had itself escaped difficulties, did likewise. See *Tilton, Constitutional Limitations on the Creation of State Debt,* 2 *Const. Conv.* 1947, 1708 (1951). That the delegates to the 1844 Constitutional Convention had in mind liability such as State bond indebtedness finds support not only from the pertinent history but also from the actual language used by them, particularly the specific requirement that the law authorizing the debt make provision "to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within thirty-five years from the time of the contracting thereof." See *McCutcheon v. State Building Authority, supra,* 13 *N. J.,* at *pp.* 67–68 (dissenting opinion); Pinsky, *State Constitutional Limitations on Public Industrial Financing*: *An Historical and Economic Approach,* 111 *U. Pa. L. Rev.* 265, 277 (1963).

In *Van Cleve v. Passaic Valley Sewerage Comrs.,* 71 *N. J. L.* 183, 228 (*Sup. Ct.* 1904), *reversed on other grounds,* 71 *N. J. L.* 574 (*E. & A.* 1905), Justice Pitney held that the constitutional limitation had no application to debts of political subdivisions such as counties and municipalities. In *Wilson v. State Water Supply Commission,* 82 *N. J. Eq.* 32 (*Ch.* 1913), Chancellor Walker applied the approach in *Van Cleve* to a debt of the State Water Supply Commission but his action was upset by the Court of Errors and Appeals, with five members of the Court dissenting. 84 *N. J. Eq.* 150, 160 (1915). The Commission had undertaken to purchase land for $1,000,000 to be met by its mortgage bonds in that sum. Though its undertaking expressly stipulated that the bondholders would have recourse only to the mortgaged property,

the majority found the bonds to be debts of the State within the meaning of the Constitution.

In his dissent, Justice Swayze pointed out that the constitutional debt limitation (which was then fixed at $100,-000) did not intend to refer to all types of unpaid obligations by all governmental branches of the State. He doubted that any day passed during which unpaid obligations incurred in behalf of State "hospitals, prisons, reformatories and other charitable institutions" did not exceed one hundred thousand dollars. He considered that such obligations did not transgress because they were not the "kind of debts and liabilities which the constitution meant to prohibit"; and he concluded his dissent in the following terms:

Some qualification must undoubtedly be placed upon the words "debts and liabilities." I think that qualification is to be found in the circumstances that existed at the time the constitution of 1844 was adopted, and that the object of the framers was to prohibit the issue of state bonds, or similar obligations, failure to pay which might expose the state to the reproach of repudiation under which some of our sister states then suffered. That reproach can never be brought in a case like the present, where the whole scheme is carefully drawn to enable the public to secure what the legislature thought was for the public benefit without the state itself incurring any legal or moral obligation whatever. The plan avoids the evils which the constitutional provision was designed to meet, since the specific property acquired must be worth what is paid for it, or the owners would not sell on such favorable terms to the purchaser, and the public can at most lose no more than the specific property. The burden of taxation is not increased. There is no danger of the state repudiating its obligations, since, by the express terms of the contract, it incurs none. 84 *N. J. Eq.* at 163.

In *New Jersey Turnpike Authority v. Parsons, supra*, 3 *N. J.* 235, bonds of the Turnpike Authority were held not to constitute obligations of the State itself. In the course of its opinion, this Court limited and distinguished *Wilson* on grounds which need not be dwelt upon here (3 *N. J.*, at *pp.* 244–46) ; suffice it to say that it flatly recognized that the Turnpike bonds, which under the statute and on their face did not pledge the faith and credit of the State and were pay-

able only from the Turnpike revenues, were not debts or liabilities of the State within the contemplation of the constitutional debt limitation. 3 *N. J.*, at *p.* 242. The Court found no occasion to determine whether the State itself or any of its non-autonomous agencies could have, without running counter to the purposes underlying the debt limitation clause, issued bonds payable solely from a self-liquidating enterprise such as the Turnpike (3 *N. J.*, at *p.* 246); elsewhere, many courts have invoked the so-called "special fund" doctrine to answer this question in the affirmative. See *Chermak, The Law of Revenue Bonds* 88 (1954); *Ratchford, American State Debts* 446 (1941); 81 *C. J. S. States* § 151, *p.* 1187 (1953); 49 *Am. Jur. States, Territories and Dependencies* § 67, *p.* 280 (1943); see also *Lacher v. Board of Trustees of State Colleges, supra,* 221 *A. 2d,* at *p.* 628; *Button v. Day,* 204 *Va.* 270, 130 *S. E. 2d* 459, 461 (1963); *State ex rel. Board of Governors, etc. v. O'Brien, supra,* 94 *S. E. 2d,* at *p.* 449; *Conder v. University of Utah, supra,* 257 *P. 2d,* at *p.* 369.

In *McCutcheon v. State Building Authority, supra,* 13 *N. J.* 46 the Legislature had created an independent State Building Authority and had empowered it to construct buildings to be leased to designated State agencies. Bonds of the Authority were to be payable only from its revenues which would come from the rentals under the leases. In holding the legislation unconstitutional, a majority of the Court took the position that the plan violated the debt limitation clause. Two members of the Court dissented in an opinion which pointed out that the bonds were payable, not by the State or from general taxation, but by the Authority solely from its revenues and, that being so, they could not rightly be said to be debts or liabilities of the State within the contemplation of the constitutional clause. See 13 *N. J.*, at *p.* 73:

The State Building Authority is expressly authorized to issue bonds but its bonds are not those of the State. On the contrary, the statute expressly provides (*R. S.* 52:18A–68) that the bonds shall not be deemed to constitute a debt or liability of the State or any

political subdivision or a pledge of the faith and credit of the State or any political subdivision. The statute further provides that the bonds shall contain on their face a statement that neither the State nor any political subdivision is pledged to pay principal or interest and that neither the faith and credit nor the taxing power of the State or of any political subdivision is pledged to pay principal or interest. Purchasers of the Authority's bonds can be under no misapprehension whatever; they rely upon the obligation of the Authority, as distinguished from the State, and upon that obligation alone.

The leases in *McCutcheon* would of course themselves entail some measure of obligation on the part of the State but, as the dissent there pointed out, they would not create any immediate debt or liability in the aggregate amount of the future rents. 13 *N. J.*, at *p.* 68. The common law did not recognize future rents as present debts or liabilities and the holdings in most of the cases throughout the country dealing with debt limitation clauses are to the same effect. See *State ex rel. La Follette v. Reuter*, 33 *Wis.* 2d 384, 147 *N. W.* 2d 304, 316 (1967); *Brook v. State Office Building Commission*, *supra*, 149 *N. E.* 2d, at *pp.* 284–287; *Lacher v. Board of Trustees of State Colleges*, *supra*, 221 *A.* 2d, at *pp.* 630–631; *Protsman v. Jefferson-Craig Consol. School Corp.*, 231 *Ind.* 527, 109 *N. E.* 2d 889 (1953); *Dean v. Kuchel*, 35 *Cal.* 2d 244, 218 *P.* 2d 521 (1950); *Ambrozich v. City of Eveleth*, 200 *Minn.* 473, 274 *N. W.* 635, 112 *A. L. R.* 269 (1937); *Jefferson School Tp. v. Jefferson Tp. School Bldg. Co.*, 212 *Ind.* 542, 10 *N. E.* 2d 608 (1937); cf. *Berger v. Howlett*, 25 *Ill.* 2d 128, 182 *N. E.* 2d 673 (1962); *McArthur v. Smallwood*, *supra*, 281 *S. W.* 2d 428; *State ex rel. Fatzer v. Kansas Armory Board*, 174 *Kan.* 369, 256 *P.* 2d 143 (1953); *Walinske v. Detroit-Wayne Joint Bldg. Authority*, 325 *Mich.* 562, 39 *N. W.* 2d 73 (1949); *Heberer v. Board of County Com'rs of Chaffee County*, 88 *Colo.* 159, 293 *P.* 349 (1930); *City of Walla Walla v. Walla Walla Water Co.*, 172 *U. S.* 1, 19, 43 *L. Ed.* 341, 349 (1898); 15 *McQuillin, Municipal Corporations* 394 (3d ed. 1950).

The dissent in *McCutcheon* also pointed out that, wholly apart from the historical precedents, there are persuasive modern-day considerations which support the view that the 1947 Constitutional Convention never contemplated the aggregation of future rents as a debt or liability within *Art.* VIII, § II, *par.* 3. In their separate opinion, the dissenting justices referred to the fact that the generally accepted accounting practice throughout the country does not encompass future rents as debts or liabilities and that corporate balance sheets would be examined in vain for reference to lease rentals payable in future years; they noted that for years prior to the 1947 Convention, New Jersey had entered into many long-term leases and though these leases were executed without any specific law supported by referendum, there never had been any suggestion that their execution violated any constitutional provision; and finally they considered it hardly conceivable that the inapt constitutional phraseology with respect to the payment of "interest" and the discharge of "principal" within the stipulated period would have been used as applicable to the leasing of property for public purposes. 13 *N. J.,* at *pp.* 70–71.

The majority in *McCutcheon* apparently viewed the rental plan as a purchase rather than a lease and as evasion rather than avoidance of the debt limitation. 13 *N. J.,* at *p.* 66. But, as the dissent pointed out, leases between affiliated governmental bodies and affiliated private corporations are common and unquestioned in our society and there was no plausible basis for dishonoring the carefully formulated leasing arrangement between the independent Building Authority and the non-autonomous agencies of the State. 13 *N. J.,* at *pp.* 77–78. Nor was there any reason for viewing the plan as illegal evasion rather than a form of legal avoidance, common in diverse fields of law.* As ex-

---

. * See *Essex Co. Retail, etc. v. Municipal Board of Alcoholic Bev. Control of City of Newark,* 77 *N. J. Super.* 70, 79 (*App. Div.* 1962):
Avoidance of the prescriptions of a statute or ordinance is entirely permissible; evasion of its requirements falls outside the bounds of

pressed in *Book v. State Office Building Commission, supra,* "It is never an illegal evasion of a constitutional provision or prohibition to accomplish a desired result, which is lawful in itself, by discovering or following a legal way to do it." 149 *N. E. 2d,* at *p.* 288; *Kelley v. Earle,* 325 *Pa.* 337, 190 *A.* 140, 147 (1937); *State v. Giessel, supra,* 72 *N. W. 2d,* at *p.* 591.

In *Kelley v. Earle, supra,* the Pennsylvania Supreme Court unanimously upheld the constitutionality of its statute which empowered its General State Authority, a public body comparable to the one created by the New Jersey Legislature in *McCutcheon,* to enter into 30-year leases with the State. Chief Justice Kephart, in his opinion for the court, pointed out that the State's undertaking was a lease rather than an "outright purchase," that on the payment of each annual rental there was a "present benefit to the State," that the bonds of the Authority were being "paid out of its revenues" and that the credit of the State was not being "pledged or bargained away." 190 *A.,* at *pp.* 146–47. The holding in *Walinske v. Detroit-Wayne Joint Bldg. Authority, supra,* was along the same lines. There a Building Authority was created to enable the construction of a joint city and county building. The Authority was to lease the building to the city and county and its bonds were to be payable from the rentals. The court, citing *Kelley v. Earle, supra,* held that the leases were to be viewed as such rather than purchases, and that they were not illegal evasions of constitutional debt limitations; in the course of his opinion, Justice Butzel said:

> The authority, not the city and county, is to pay for and erect the proposed building, and is to be the sole obligor on the proposed revenue bonds. The city and county will not pledge their full faith and credit, but they merely agree to pay over a term of years a reasonable annual rental for an absolute necessity the same as they

---

legal activity. This distinction is most often found in the field of taxation. For example, see *Jones v. Grinnell,* 179 *F.* 2d 873 (10 *Cir.* 1950); *Distinctive Theatres of Columbus, Inc. v. Looker,* 165 *F. Supp.* 410, 411 (*D. C. Ohio* 1958).

would for any other services. It is true that a prudent investor in the revenue bonds will be attracted by the fact that the city and county agree to pay sufficient rent so as to pay the bonds and interest, that the moral risk of the lessors is the very best, and that a quasi-municipal corporation, like the Authority is the obligor on the bonds. The method is new, but is being adopted by municipal corporations, under enabling acts, to provide for much needed facilities which they otherwise could not have without raising the tax rates they could charge or because of bond debt limitations. Inasmuch as the bonds proposed to be issued by the Authority are not faith and credit obligations of its incorporators, they need not be voted on by the electorate, nor are they subject to the debt limitations of the municipalities. 39 *N. W. 2d,* at *p.* 81.

Both *Kelley* and *Walinske, supra,* were pre-*McCutcheon* decisions but since *McCutcheon* was handed down, many additional out-of-State cases have rejected the thesis of its majority opinion. Thus in *Book v. State Office Building Commission, supra,* the Indiana Supreme Court unanimously upheld the validity of its State Office Building Act which had created an independent Commission with power to construct a building to house various state departments, and to issue revenue bonds payable from rentals under leases with such departments. In approaching the subject, the court expressed the view that, within the limits necessary for the preservation of our form of government and the principles on which it rests, the Constitution "must be construed to the end that public progress and development will not be stifled and that public problems, with their ever increasing complexity, may be met and solved to the best interests of the public generally." 149 *N. E. 2d,* at *p.* 281. The fact that the rentals were admittedly geared to satisfy the bonded indebtedness and enable the State ultimately to become the owner of the buildings, was held not to preclude the finding that the agreements between the Commission and the departments were leases and not contracts of purchase. See *Petition of Board of Public Buildings, supra,* 363 *S. W. 2d,* at 605; *State v. Giessel, supra,* 72 *N. W. 2d,* at *p.* 591; cf. 405 *Monroe Co. v. City of Asbury Park,* 40 *N. J.* 457, 464–66 (1963).

Similarly in the following cases, statutes were sustained creating independent authorities empowered to construct public buildings and lease them to state agencies, the rentals being used in payment of the authorities' bonds. See *McArthur v. Smallwood, supra,* 225 *Ark.* 328, 281 *S. W. 2d* 428 (state office building); *State ex rel. Fatzer v. Kansas Armory Board, supra,* 174 *Kan.* 369, 256 *P. 2d* 143 (state armories); *Petition of Board of Public Buildings, supra,* 363 *S. W. 2d* 598 (state office building); *Application of Oklahoma Capitol Improvement Auth., supra,* 355 *P. 2d* 1028 (state office building); *Application of Oklahoma Capitol Improvement Auth.,* 410 *P. 2d* 46 (*Okl.* 1966) (public safety buildings); cf. *State v. Giessel, supra,* 271 *Wis.* 15. 72 *N. W. 2d* 577 (state office building, athletic practice building, university dormitories); *Berger v. Howlett, supra,* 25 *Ill. 2d* 128, 182 *N. E. 2d* 673 (state hospital, penitentiary, etc.).

Although these decisions, along with the dissent in *McCutcheon,* appear to us to be clearly the more persuasive, the Education Facilities Authority stands on even firmer ground. The Building Authority in *McCutcheon* was created to aid the State government and, under the explicit terms of the statute, it could lease its buildings only to designated State departments whose rental payments would come entirely from legislative appropriations. 13 *N. J.,* at *p.* 62. On the other hand, the Educational Facilities Authority was created to benefit the public through the expansion of college and university facilities within the State, and the annual rentals on its leases with the participating public and private educational institutions were intended to come mainly from sources unrelated to legislative appropriations. With that in mind, its operations may be compared favorably to the many self-liquidating projects which have been sustained in our State (*New Jersey Turnpike Authority v. Parsons, supra,* 3 *N. J.* 235) and elsewhere. See *Conrad v. City of Pittsburgh,* 421 *Pa.* 492, 218 *A. 2d* 906 (1966) (city stadium); *State ex rel. State Park and Recreation Commis-*

*sion v. New Mexico State Authority,* 76 *N. M.* 1, 411 *P. 2d* 984 (1966) (boat dock facility in state park); *cf. Opinion of the Justices, supra, Mass.,* 236 *N. E. 2d* 523 (higher educational facilities); *Lacher v. Board of Trustees of State Colleges, supra,* 243 *Md.* 500, 221 *A. 2d* 625 (college dormitories); *Conder v. University of Utah, supra,* 123 *Utah* 182, 257 *P. 2d* 367 (college dormitories); *State ex rel. Board of Governors etc. v. O'Brien, supra,* 142 *W. Va.* 88, 94 *S. E. 2d* 446 (college buildings); *Button v. Day, supra,* 205 *Va.* 739, 139 *S. E. 2d* 838 (college buildings).

In the light of all of the foregoing, we have no hesitancy in expressing our agreement with the trial court's holding that the legislative plan embodied in the Educational Facilities Authority law did not in anywise violate the debt limitation clause of the Constitution (*Art.* VIII, § II, *par.* 3). Nor do we have any hesitancy in rejecting the defendant Kervick's contention that the Authority's aid to private non-sectarian educational institutions would violate the constitutional provisions against the State's loan of its credit (*Art.* VIII, § II, *par.* 1) and the donation of land or the appropriation of money by the State to any society, association or corporation (*Art.* VIII, § III, *par.* 3). See *Roe v. Kervick, supra,* 42 *N. J.* 191; *Fairfax County Industrial Development Auth. v. Coyner,* 207 *Va.* 351, 150 *S. E. 2d* 87 (1966); *Berger v. Howlett, supra,* 25 *Ill. 2d* 128, 182 *N. E. 2d* 673; *Pinsky, supra,* 111 *U. Pa. L. Rev.* 265.

In *Roe v. Kervick, supra,* 42 *N. J.* 191, this court dealt with the Area Redevelopment Assistance Act (*L.* 1962, *c.* 204) which involved State aid to redevelopment projects, owned and operated for private profit, but providing job opportunities in economically distressed areas. It rejected attacks on the act under *Art.* VIII, § II, *par.* 1 and *Art.* VIII, § III, *par.* 3, pointing out that the strictures in *Article* VIII were designed to insure that public money would be raised and used only for public purpose, and noting that incidental private benefit would not defeat execution of a paramount public purpose. 42 *N. J.,* at *p.* 207,

218; see *Massachusetts Bay Tr. A. v. Boston Safe Dep. & T. Co.*, 348 *Mass.* 538, 205 *N. E.* 2d 346, 354, 360 (1965); *Fairfax County Industrial Develop. Auth. v. Coyner, supra,* 150 *S. E.* 2d, at p. 93. It found that the legislative plan did not infringe the constitutional policy for it served a clear public purpose, with adequate consideration to the State, and sufficient accompanying standards to insure fulfillment of the public objective. See *City of Bayonne v. Palmer,* 90 *N. J. Super.* 245, 274 (*Ch. Div.*), affirmed, 47 *N. J.* 520 (1966).

The conditions set forth in *Roe* were more than met in the Educational Facilities Authority law. That the furtherance of higher education is a proper public purpose is beyond dispute, and equally clear is the urgency of the need for the expansion of the existing facilities. In its preamble, the statute declared that a "serious public emergency" existed because financial resources were lacking with which "to construct required dormitory and other educational facilities at public and private institutions of higher education." *N. J. S.* 18*A* :72*A*–1. It then proceeded with its detailed provisions, all of which were designed to further the public interest, without creating any State debt or liability and without granting private benefits except to the incidental extent necessary to achieve the public objective.

Those colleges and universities which participate will necessarily be expanding their educational facilities, thereby affording substantial consideration to the State which is charged with a high public duty in the field. The safeguards and controls contemplated by the act (*N. J. S.* 18*A* :72*A*–5; *N. J. S.* 18*A* :72*A*–30), along with those in other statutory enactments governing the licensure and conduct of New Jersey's institutions of higher learning, are undoubtedly sufficient, for it must be borne in mind that, unlike the situation in *Roe,* there is no danger here at all that public funds may be diverted to private profit-making. By their very creation and nature, the participating institutions are all dedicated towards the faithful discharge of society's responsibility and

theirs for affording adequate opportunities for higher education.

 The trial court's final holding was that even though the parties have agreed, for purposes of the cross motions, that the act is invalid in part, it may nonetheless be sustained in all of its remaining parts. We consider this holding to be clearly correct regardless of whether traditional severability principles apply, as the defendant Kervick suggests, or the principle that a statute will be upheld to the fullest extent constitutionally permissible applies, as the intervening plaintiff suggests. In the light of the statutory goal and the urgent need, it may safely be assumed that the Legislature would wish the Authority to proceed with its projects in aid of public and secular colleges and universities, even though it were not constitutionally permitted to aid sectarian institutions. That being so, the judicial responsibility to enable this highly desirable course would appear to be entirely evident. See *Borough of Sayreville v. Pennsylvania R. R.*, 26 *N. J.* 197, 200, appeal dismissed, 358 *U. S.* 44, 79 *S. Ct.* 43, 3 *L. Ed.* 2d 45 (1958); *Hansen v. Raleigh*, 391 *Ill.* 536, 63 *N. E.* 2d 851, 856, 163 *A. L. R.* 1425 (1945); 16 *Am. Jur.* 2d *Constitutional Law* § 194, *pp.* 427–28 (1964).

The judgment of the Law Division sustaining the constitutionality of the Educational Facilities Authority law (*N. J. S.* 18A :72A–1 *et seq.*) is in all respects:

Affirmed.

HALL, J. (concurring in part and dissenting in part) : In *Roe v. Kervick*, 42 *N. J.* 191, 234 (1964) (concurring opinion), I expressed the view that approval of the legislation there involved, providing for the financing by state moneys of private projects in aid of a public purpose, carried non-applicability of the constitutional public aid limitations (*Art.* VIII, *sec.* II, *par.* 1 and *Art.* VIII, *sec.* III, *par.* 3) about as far as can be without completely writing them off. Here the statutory provisions as related to private colleges are extremely broad, authorizing the Authority to loan money to

such institutions (*N. J. S.* 18*A* :72*A*–31) and to acquire, construct and lease "educational facilities" for them (*N. J. S.* 18*A* :72*A*–30). Such "facilities" may include practically anything conceivable for a modern college campus, right down to parking lots, *N. J. S.* 18*A* :72*A*–3.

The difficulty I find is that there is nothing express or implied in the act requiring any private college, as a condition of such assistance, to expand its enrollment by even one student, let alone one residing in New Jersey. Such an institution could legitimately utilize the benefits of the law simply to modernize its buildings and facilities and maintain the present size of its student body. The whole tenor of the act's preamble (*N. J. S.* 18*A* :72*A*–1) is the state's crying need for additional college facilities to educate *more* New Jersey people, who now have to be exported to other states to secure higher education. There is therefore no assurance that this basic purpose will be effectuated in the case of private colleges. So, I am of the view that the scheme, as to such institutions, goes beyond the line of constitutionally permissible public aid projects and the provisions of the act providing benefits to private colleges are invalid in their present form.

I agree with the majority that the constitutional debt limitation provision (*Art.* VIII, *sec.* II, *par* 3) is not violated by the act, because it is clear enough that no state appropriations or moneys will be required or can be compelled to be provided to enable the Authority to pay its obligations. Even in the case of benefits extended to public colleges, the cost of or rent for facilities it will construct or otherwise make available will be deferred from revenue paid by third persons for the use thereof. While the majority does not expressly overrule *McCutcheon v. State Building Authority,* 13 *N. J.* 46 (1953), it does whittle it down so that substantially nothing is left. I believe the case still ought to remain as sound law to the extent of its general holding that the debt limitation provision is violated (assuming the amount involved is sufficient) where the revenue to pay for state governmental (or for that matter, educational) buildings furnished through an authority,

and thus to satisfy that authority's obligations, must and will come, in reality, only from state appropriations. The interposition of a so-called autonomous agency between the Legislature and the state agency or department benefited in such a situation is to me, realistically, only doing indirectly by means of a conduit what may not validly be done directly, absent referendum approval.

If it is felt we can no longer live with the debt limitation and public aid project provisions of the 1947 Constitution, they ought to be amended by the prescribed method rather than through legislative nullification or evasion and judicial sanction thereof.

I would consequently affirm the judgment below with respect to the public college provisions of the act and reverse it as to those benefiting private colleges.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance in part and reversal in part*—Justice HALL —1.